558 P.2d 975

**Louis R. CATHEMER and Mary Cathemer, husband and wife, Appellants,**

v.

**Willard HUNTER and Delores Hunter, husband and wife, Appellees.**

**No. 1 CA–CIV 2980.**

Court of Appeals of Arizona,
Division 1,
Department A.

Nov. 4, 1976.

Rehearing Denied Dec. 9, 1976.

Petition for Review Denied Jan. 11, 1977.

Marvin Johnson, P. C. by John P. Otto, Phoenix, for appellants.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Donald E. Dyekman, Phoenix, for appellees.

## OPINION

NELSON, Judge.

This is an appeal from a directed verdict entered for appellee, Dr. Willard Hunter, who was sued for a battery allegedly committed upon the appellant, Louis R. Cathemer.

Contained within the general issue of the propriety of the rendition of the directed verdict are two questions:

(1) Whether the appellant consented to the operation performed by Dr. Hunter, and if not, whether the operation actually performed is nonetheless substantially similar to the one consented to by the appellant.

(2) Whether appellant now on appeal may allege new theories of negligence and breach of contract to bolster his request for reversal of the directed verdict.

When reviewing the grant of a motion for summary judgment, this Court must consider the evidence and the reasonable inferences therefrom in a light most favorable to the opposing party. *Hendricks v. Simper*, 24 Ariz.App. 415, 539 P.2d 529 (1975). In so reviewing, we must assume the testimony of the appellant is correct. *Avechuco v. Awtrey*, 106 Ariz. 44, 470 P.2d 451 (1970).

The evidence reveals that the appellant, a resident of Florence, Arizona, first met Dr. Hunter in September 1968, in the office of Dr. William J. Clemans, the appellant's regular physician. Dr. Clemans had requested Dr. Hunter to consult with him regarding a painful right hip suffered by the appellant. Dr. Hunter was reputed to possess a special expertise in a new total hip replacement procedure developed in England. In fact, Dr. Hunter had traveled to England and studied the procedure with the originator of the new methodology.

At the consultation, Dr. Hunter diagnosed the appellant's ailment to be bursitis. Dr. Hunter on five subsequent occasions examined the appellant in Dr. Clemans' office and at one time recommended that the appellant see another physician, which the appellant did.

On January 21, 1971, appellant visited Dr. Hunter's Phoenix office. At this time, appellant informed Dr. Hunter that he had heard that Arthur Godfrey, a radio celebrity, had excellent success following his total hip replacement operations. Appellant then told Dr. Hunter that he understood that Dr. Hunter had been to England to

study and that he could perform the same "total hip replacement".

Dr. Hunter replied that he could perform the procedure, which consisted of chiseling out the hip socket and cementing in its place a plastic cup. Then the femur would be cut off and a prosthesis would be inserted, consisting of a pin with a ball on top of it to be connected to the femur and then the ball would be placed in the *new* cup.

Dr. Hunter then told the appellant that it was a "terrific operation", that the appellant would not have any difficulty afterwards and that he "could walk just like anybody else". Appellant then agreed to have what he believed would be a "total hip replacement".

On January 26, 1971, the evening before the scheduled operation, appellant signed a form entitled "Consent To Operation, Administration of Anesthetics, and The Rendering Of Other Medical Services". The pertinent portion of the consent form reads as follows:

"I authorize and direct Dr. W. Hunter M.D. my surgeon and/or associates or assistants of his choice to perform the following operation upon me *Hip Prosthesis On Right Side* and/or to do any other therapeutic procedure that (his) (their) judgment may dictate to be advisable for the patient's well-being. The nature of the operation has been explained to me and no warranty or guarantee has been made as to the result or cure." [1] (Emphasis added)

When the appellant signed the form, he testified that he did not understand what "hip prosthesis on right side" meant. He testified that Dr. Hunter had never explained to him what those words meant before he signed the form. He testified that it was his understanding that Dr. Hunter was going to perform a "total hip replacement" operation. When asked if he would have agreed to an operation whereby only a steel pin would be inserted into his femur, appellant replied "no".

1. The phrase "Hip Prosthesis On Right Side" was handwritten on the form by one of the hospital personnel. Dr. Hunter apparently had

Nonetheless, on January 27, 1971, Dr. Hunter performed, instead of a "total hip replacement" whereby the hip socket would be replaced and a prosthesis inserted in the femur, the procedure of a "hip prosthesis on right side", which consisted only of the insertion of the pin and ball into the right femur, leaving the socket untouched. Dr. Hunter testified that he was not sure exactly what he told the appellant the procedure consisted of, but he was sure he never told the appellant that he was going to receive a *"total hip replacement"*.

Following the operation, appellant suffered fever and pain as a result of an infection that had developed at the site of the surgery. Post-operative complications continued and on March 25, 1971, Dr. Hunter removed the prosthesis. It was at this time that appellant discovered that Dr. Hunter had not performed a "total hip replacement" operation on January 27th but had only inserted the steel pin. This litigation then ensued, the appellant only pleading and proceeding on the theory of battery against Dr. Hunter. The trial court directed a verdict for Dr. Hunter at the close of the appellant's case, apparently on the grounds that the consent form only spoke of a right hip prosthesis, which is exactly what Dr. Hunter performed, and that the operation that the appellant received was within the scope of the operation the appellant believed he consented to.

CONSENT FORM

The first issue focuses on whether the appellant, in signing the consent form, agreed to allow Dr. Hunter to perform the "right hip prosthesis" and, if he did not, was the right hip prosthesis nevertheless the same but a "lesser-included" operation of a "total hip replacement" which the appellant had wanted.

The law is well established that if a physician operates upon a patient without the patient's consent, the physician has committed a battery upon the patient and is

telephoned in the phrase the day before the operation.

liable in damages therefor.[2] *Shetter v. Rochelle,* 2 Ariz.App. 358, 409 P.2d 74 (1965), modified 2 Ariz.App. 607, 411 P.2d 45 (1966); *Riedisser v. Nelson,* 111 Ariz. 542, 534 P.2d 1052 (1975); *Perin v. Hayne,* 210 N.W.2d 609 (Iowa 1973); *Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972); *Restatement (Second) of Torts* § 13 (1965); Annot. 56 A.L.R.2d 695; Annot. 139 A.L.R. 1370; Annot. 76 A.L.R. 562.

The recognized rule is enunciated in 76 A.L.R. at 562:

"The general rule seems to have become well established that, before a physician or surgeon may perform an operation upon a patient, he must obtain the consent either of the patient, if competent to give it, or of someone legally authorized to give it for him, unless immediate operation is necessary to save the patient's life or health, although under exceptional circumstances the consent may be regarded as having been impliedly given. (The action for operating without consent seems usually to be regarded as one for assault or trespass, rather than for negligence)."

Thus, a patient who is of full capacity and who freely and without fraud or mistake manifests to the physician an assent to the anticipated conduct of the physician upon the patient's person may not later maintain an action in battery against that physician. *Restatement (First) of Torts* § 892 (1939).

The essence, therefore, of an informed consent question in a battery case involving a physician is what did the patient agree with the physician to have done, and was the ultimate contact by the physician within the scope of the patient's consent.

In Prosser, *The Law of Torts,* § 18 at pp. 103–105, (4th ed. 1971) the issue is lucidly explored:

"The consent is to the plaintiff's conduct, rather than to its consequences. If the plaintiff willingly engages in a boxing match, he does not of course consent to be killed, but he does consent to the defendant's striking at him, and hitting him if he can; and if death unexpectedly results, his consent to the act will defeat any action for the resulting invasion of his interests. He does not, on the other hand, consent to being hit with brass knuckles, which is the same invasion by an act of a different character.

*"The defendant's privilege is limited to the conduct to which the plaintiff consents, or at least to acts of a substantially similar nature.* A consent to a fight with fists is not a consent to an act of a different nature, such as biting off a finger, or stabbing with a knife. Permission to dump "a few stones" upon property is not a permission to cover it with boulders. If the defendant goes beyond the consent given, and does a substantially different act, he is liable.

"The rule frequently is applied to surgical operations. Consent to operate on the right ear is not necessarily consent to operate on the left, and a patient who agrees to a blood test or a minor operation on his nose does not thereby consent to a spinal puncture, or the removal of his tonsils. With the patient unconscious under an anaesthetic, and unable to be consulted, the mere desirability of the operation does not protect the surgeon, who becomes liable for battery—which, in addition to making him liable for at least nominal and perhaps punitive damages, renders quite immaterial any question of whether he has complied with good professional practice. It is of course possible that the situation may be one of unforeseen emergency, critical in its nature, which will justify the surgeon in proceeding on the assumption that the patient would consent if he were conscious and

**2.** Arizona's Thirty-Second Legislature in its First Special Session in 1976 abrogated a patient's common law right to sue his physician or medical health provider upon the theory of assault and battery. A.R.S. § 12–562(B), Laws 1976, Ch. 5.1, Art. I, eff. February 27, 1976. This abrogation, however, does not affect this appellant's cause of action which accrued in 1971.

understood the situation. It is also possible that the consent given will be sufficiently general in its terms to cover the particular operation, or that the surgeon may be authorized with complete freedom to do whatever he thinks best to remedy whatever he finds, particularly where the patient has signed one of the written forms in common use in hospitals. *Such questions are matters of fact, which normally are to be determined by the jury.* The general approach of the law has certainly changed from quite a rigorous one at the beginning of the century to much greater liberality toward the surgeon, in the light of the conditions under which operations are now performed. But it is still at least true that where an operation is found to have been prohibited, the surgeon is not saved from liability by his good intentions in proceeding with it." (Emphasis added)

This Court in *Shetter v. Rochelle,* supra, spoke on the issue of an effectual consent:

"Summarizing, we hold that a consent to a surgical procedure is effectual if the consentor understands substantially the nature of the surgical procedure attempted and the probable results of the operation. This, as a matter of law, constitutes an informed consent. Lacking this, the operation is a battery unless some special exception pertains." 2 Ariz.App. at 370, 409 P.2d at 86.

In commenting specifically on the issue of the scope of the patient's consent and whether the ultimate procedure was embraced within the consent, the court in *Perin v. Hayne,* citing with approval the California case of *Cobbs v. Grant,* supra, stated:

"We agree with the majority trend. The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented. When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent given is present. However, when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information. In that situation the action should be pleaded in neglience [sic]." 210 N.W.2d at 618

■ In reviewing the facts of this case in the light most favorable to the appellant, *Hendricks v. Simper,* supra, it is evident that the appellant signed the consent form believing the language "hip prosthesis on right side" meant he was consenting to the "total hip replacement" procedure described to him by Dr. Hunter in an earlier consultation. Dr. Hunter himself admits he never explained the consent form to the appellant and never once unequivocally dispelled the belief in the appellant's mind that he was going to receive the "total hip replacement". Even though Dr. Hunter testified that he never told the appellant he was going to perform the "total hip replacement" operation on the appellant, he nevertheless held himself out to the appellant as an expert in "total hip replacement" operations. When asked by the appellant whether he could perform the hip operations successfully received by Arthur Godfrey, Dr. Hunter replied he was expertised in those types of "total hip replacement" operations.

Moreover, the fact that had the appellant known at the time of the signing of the consent form that he was only agreeing to "the insertion of a steel pin and or in the femur of the right leg" and on that basis would not have signed the form, indicates he did not authorize Dr. Hunter to perform the operation that was actually accomplished.

■ We are also unpersuaded by the argument of Dr. Hunter that the right hip prosthesis that was actually performed involved the same procedures as the "total hip replacement" operation, touched the same area of the body, and was in fact a

"lesser-included" operation of the "total hip" procedure. The test is that the operation actually undertaken must be of a *substantially similar nature* as the one consented to, *Prosser,* supra, and the patient must understand substantially the nature of the actual procedure attempted. *Shetter v. Rochelle,* supra.

In this case, it is difficult to see how the trial court could have concluded as a matter of law that the right hip prosthesis is substantially the same operation as the total hip replacement. The latter involves the total replacement of the hip socket while the former does not. Moreover, as evidenced by the length of Dr. Hunter's own testimony, the description of right hip prosthesis only consumed one and one-half pages of transcript testimony, while the "total hip replacement" description took four and one-half pages.

■ In any case, the appellant requested one type of operation. He was given a different type, one that he did not understand nor consent to. To assert, as the appellee does, that the right hip prosthesis is a "lesser-included" operation overlooks the primary element of the tort of battery, to wit, the *unauthorized* touching of another person. *Prosser,* supra, § 10, p. 36. Here, appellant only authorized Dr. Hunter to accomplish a "total hip replacement" touching; he did not authorize a right hip prosthesis touching. Had he known he was receiving a right hip prosthesis, he would not have consented.

The directing of the verdict in favor of Dr. Hunter was improper. The construction incumbent upon this Court to give to the facts certainly creates a jury question as to whether appellant consented to the right hip prosthesis and as to whether this is a substantially similar operation to be within the scope of the purported consent of the appellant. Resolution of the above cited issues, upon the evidence that was presented, was properly for the jury's determination. *Stauffer v. Karabin,* 30 Colo. App. 357, 492 P.2d 862 (1971); *Prosser,* supra, § 18.

## NEW THEORIES OF LIABILITY ON APPEAL

■ Appellant for the *first time* in this case asserts in his reply brief that Dr. Hunter may also be liable to him on the theories of negligence and breach of contract. Appellant contends that the appellee acquiesced to introduction of evidence at trial that would support these theories, and urges this as an additional basis for setting aside the verdict.

While the appellant's argument is akin· to a request, pursuant to Rule 15(b), Rules of Civil Procedure, 16 A.R.S., to amend his pleadings to conform to the evidence, we feel that his efforts are inappropriate here. Rule 5(e), Supreme Court Rules, 17A A.R.S., mandates that the contents of the appellant's reply brief:

" . . . shall be confined to replying to questions either of law or fact raised by appellee's brief which were not contained in appellant's opening brief."

■ The appellee's brief in this instance alluded to the issue of malpractice when it stated correctly that this case was tried strictly on the issue of battery, and not on negligence or breach of contract. The appellant in his reply brief for the first time alleges that the case was tried by consent of the appellee on the theories of negligence and breach of contract. This matter was never presented to the trial court, by motion or argument, at any stage of the proceedings. We believe this new proposition presented by appellant is untimely in this Court and we have not considered it in reviewing the propriety of the directed verdict. Cf. *Apex Smelting Co. v. Burns,* 175 F.2d 978 (7th Cir. 1949). An argument first raised in a reply brief on appeal is too late and will not be considered. *Miller v. Boeger,* 1 Ariz.App. 554, 405 P.2d 573 (1965); *Evans v. Lundgren,* 11 Ariz.App. 441, 465 P.2d 380 (1970).

■ The fact that we have not considered the theories of negligence and breach of contract on this appeal does not, however, preclude the appellant from moving for an amendment to his pleadings to include these theories at the retrial of this

matter, Rule 15(a), Rules of Civil Procedure, 16 A.R.S. The granting of such a request at this point resides within the sound discretion of the trial court, *Cagle v. Carr,* 101 Ariz. 225, 418 P.2d 381 (1966); however, amendments should be permitted with great liberality so that cases may be decided on the merits rather than on mere technicalities of pleadings. *Cagle v. Carr,* supra. This is especially true in this instance where it is becoming more accepted than an action in battery against a physician is in reality one for negligence in failing to conform to the proper standard of care. *Perin v. Hayne,* supra; *Prosser,* supra, § 32, pp. 165–166; A.R.S. § 12–562(B), (see Footnote 2, supra).

The judgment of the trial court is reversed and this cause is remanded for a new trial.

DONOFRIO, P. J., and OGG, J., concur.