BETTY L. PERNA AND THOMAS R. PERNA, JR., PLAINTIFFS-APPELLANTS, v. MICHAEL J. PIROZZI, M.D., ANTHONY DEL GAIZO, M.D., AND PATRICK N. CICCONE, M.D., DEFENDANTS-RESPONDENTS, AND MANSOOR KARAMOOZ, M.D., DEFENDANT.

Argued October 25, 1982—Decided March 2, 1983.

*William O. Barnes, Jr.,* argued the cause for appellants (*Barnes & Barnes,* attorneys).

*John L. Shanahan* argued the cause for respondents (*Shanahan & McLarty,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

This appeal challenges the validity of *R.* 4:21, which requires the pre-trial submission of medical malpractice claims to a panel consisting of a judge, an attorney and a physician. More specifically, the appeal questions whether a plaintiff may cross-examine a defendant-doctor about alleged prior inconsistent statements at a panel hearing and whether the trial court may refuse to permit a plaintiff to show possible bias of the panel-doctor in favor of the defendant-doctor. With respect to the latter issue, plaintiffs did not object to the doctor at the time of the panel hearing, but sought at trial to introduce a questionnaire in which the panel-doctor indicated that he knew the defendant-doctors. The appeal questions further whether *R.* 4:21 results in an unconstitutional denial of the right to trial by jury and of equal protection.

In addition, the appeal inquires about the nature of the cause of action of a patient who consents to surgery by one surgeon but is actually operated on by another surgeon. Plaintiffs resist the characterization of their cause of action as a battery and contend that a non-consensual substitution of one surgeon for another is more appropriately characterized as a violation of the doctrine of informed consent. We must determine whether that substitution, even when the two surgeons are engaged in a group practice, constitutes malpractice, a battery or both.

The medical malpractice panel unanimously found no basis for plaintiffs' claims of malpractice, but made no determination on the informed consent issue, which it found to be purely factual and, thus, not subject to panel disposition. See *R.* 4:21–2(d).

At trial, the panel determination was admitted in evidence. The trial court, however, refused to permit plaintiffs to show that the panel-doctor, in answer to a questionnaire submitted to prospective panelists, had stated that he was acquainted professionally with defendant Dr. Pirozzi. Also, the court refused to permit cross-examination of Dr. Pirozzi about prior inconsistent statements he allegedly made before the panel. The jury returned a verdict of no cause of action in favor of defendants.

In affirming the judgment of the trial court, the Appellate Division sustained the constitutionality of *R.* 4:21 and ruled that the operation by a doctor other than the one identified in the consent form is not malpractice, but a battery. 182 *N.J.Super.* 510 (1982). We granted certification, —— *N.J.* —— (1982).

We agree that *R.* 4:21 is constitutional and that the operation by the second physician may be considered to be a battery. However, we conclude that the trial court's refusal to permit plaintiffs to show possible bias of the panel-doctor and to impeach the testimony of the defendant-doctor constituted reversible error. Consequently, we reverse and remand the matter to the Law Division.

I

On the advice of his family physician, Thomas Perna entered St. Joseph's Hospital on May 8, 1977 for tests and a urological consultation. Mr. Perna consulted Dr. Pirozzi, a specialist in urology, who examined Mr. Perna and recommended that he undergo surgery for the removal of kidney stones.

Dr. Pirozzi was associated with a medical group that also included Drs. Del Gaizo and Ciccone. The doctors testified at trial that their medical group customarily shared patients; no doctor had individual patients, and each doctor was familiar with all cases under care of the group. Further, it was not the practice of the group to inform patients which member would operate; the physicians operated as a "team," and their regular practice was to decide just prior to the operation who was to operate. If, however, a patient requested a specific member of the group as his surgeon, that surgeon would perform the operation. Nothing indicated that Mr. Perna was aware of the group's custom of sharing patients or of their methods for assigning surgical duties.

Although Mr. Perna had never consulted with Dr. Del Gaizo or Dr. Ciccone, he had been treated by Dr. Pirozzi previously in conjunction with a bladder infection. According to Mr. Perna, he specifically requested Dr. Pirozzi to perform the operation. None of the defendants directly contradicted Mr. Perna's testimony. However, Dr. Ciccone testified that he met with Mr. Perna on May 16 and, without discussing who would operate, explained that two members of the medical group would be present during the operation. The following day, in the presence of a urological resident, Mr. Perna executed a consent form that named Dr. Pirozzi as the operating surgeon and authorized him, with the aid of unnamed "assistants," to perform the surgery.[1] In this context, the term "assistants" refers to medi-

---

[1] The consent form provided in relevant part:

cal personnel, not necessarily doctors, who aid the operating surgeon. *See* Judicial Council of the American Medical Ass'n, op. 8.12 (1982) (reproduced in full at *infra* note 3). The operation was performed on May 18 by Dr. Del Gaizo, assisted by Dr. Ciccone. Dr. Pirozzi was not present during the operation; in fact, he was not on duty that day. At the time of surgery, Dr. Del Gaizo and Dr. Ciccone were unaware that only Dr. Pirozzi's name appeared on the consent form.

Mr. Perna first learned of the identities of the operating surgeons when he was readmitted to the hospital on June 11 because of post-surgical complications. Subsequently, Mr. and Mrs. Perna filed suit for malpractice against all three doctors, alleging four deviations from standard medical procedure concerning the diagnosis, treatment and surgery performed by the defendants. They further alleged that there was a failure to obtain Mr. Perna's informed consent to the operation performed by Dr. Del Gaizo. That is, plaintiffs claimed that Mr. Perna's consent to the operation was conditioned upon his belief that Dr. Pirozzi would be the surgeon.

Pursuant to *R.* 4:21, the matter proceeded to a mandatory hearing before a medical malpractice panel. The physician member of the panel, Dr. Litzky, had indicated in response to a questionnaire that he knew Dr. Pirozzi from attending professional meetings. Plaintiffs' counsel did not object to Dr. Litzky serving on the panel, which unanimously found no basis for the claims pertaining to the diagnosis, treatment and operation performed by defendants.

---

INFORMED CONSENT TO OPERATION OR OTHER SPECIAL PROCEDURE

   1. I, *Thomas Perna,* authorize *Dr. Pirozzi* and his assistants to treat the condition or conditions which are indicated by the examinations and studies already performed.

   ... 2. The procedure[s] necessary to treat my condition, as explained to me by Dr. ___ are: *remove stone from rt. kidney through flank incision.* (Underscored portions indicate blanks on standard consent form).

The case came on for trial before a jury. Notwithstanding the objection of plaintiffs' counsel, the unanimous panel findings were admitted into evidence in accordance with *R.* 4:21–5(c). Counsel contended that the absence of a record before the panel prevented effective cross-examination of Dr. Pirozzi on statements allegedly made at the panel hearing. Furthermore, plaintiffs' counsel unsuccessfully sought to introduce the answered questionnaire submitted by the panel doctor indicating that he was acquainted with Dr. Pirozzi from professional meetings attended by the two doctors.

In its original charge on informed consent, the trial court instructed the jury:

Should you determine with regard to the first operation of May 18, 1977, the plaintiff's consent to the operation was based on the fact that Dr. Pirozzi was to perform the operation and that that was his understanding with the doctor and further determine that such failure of informed consent constituted a deviation from accepted medical standards and that if there was such deviation constituting medical malpractice, it was the proximate cause as I will define that term for you of the plaintiff's damages, then you must find for the plaintiff on this issue. However, should you determine that with regard to the first operation of May 18, 1977, there was no understanding that Dr. Pirozzi would perform the operation or that any two members of the group would perform it or that such failure of informed consent was not such deviation from accepted medical standards as to constitute medical malpractice or should you find that such medical malpractice was not a proximate cause as I will define that term for you of the plaintiff's damages, then you must find for the defendants on this issue.

The court then gave a standard charge on proximate cause. Neither party objected to the submission of the issue of unauthorized surgery in this form. Subsequent to the initial charge, the jury requested further instructions on the issue of informed consent: "In your charge to the jury with reference to informed consent, is there a basis for malpractice if consent was given to one physician and another operated but no deviation from standard surgical procedures were involved?"

The trial court advised counsel in advance of a proposed supplemental charge, which undertook to explain that, in addition to proving medical malpractice, plaintiffs were required to establish that the malpractice was a proximate cause of their damages. For various other reasons not relevant to this appeal,

including an unfortunate confusion of the words "cause" and "result", the supplemental charge was flawed. Plaintiffs' counsel objected to the charge, contending that the only appropriate response to the jury's question was an affirmative answer. Nonetheless, the court delivered the supplemental charge, and the jury subsequently returned a unanimous verdict of no cause of action in favor of defendants.

II

Rule 4:21 is an attempt, in the interests of the medical and legal professions and the public, to solve some of the problems of medical malpractice suits. *R.* 4:21–1. The purpose of the rule is to process "medical malpractice actions with the view toward discouraging baseless actions and encouraging settlement of those actions based on reasonable medical probability; to monitor efficiently these cases through the courts; and to assist in the early disposition of medical malpractice actions." *Id.* In practice, the rule requires the pretrial screening of medical malpractice actions, except those in which the sole factual issue is one of witness credibility, by a three-member panel composed of a Superior Court judge, an attorney and a physician.

At the time of their selection, the attorney and physician are required to "disclose any circumstances likely to create a presumption of bias or which they believe might otherwise disqualify them." *R.* 4:21–5(b). The disclosed information is forwarded to all parties, after which they have 15 days to object to the designation of the attorney or doctor. *R.* 4:21–4(b).

The panel hearing is informal and without a verbatim record, and the proceeding is confidential and in camera. *R.* 4:21–7. Except as otherwise provided in *R.* 4:21–5, no statement or expression of opinion made at the hearing is admissible in evidence at trial. If the panel is unanimous in its finding as to whether there was malpractice, that finding is admissible at trial upon the request of any party to the hearing. The recommendation is not binding upon the trier of fact, but shall be

accorded such weight as the jury or the judge sitting as the trier of the facts chooses to ascribe to it in view of all the relevant information adduced at trial. *R.* 4:21–5(e).

A unanimous recommendation, however, poses a serious obstacle to adverse parties. *Corbo v. Crutchlow,* 86 *N.J.* 68, 77 (1981). Although not binding, the panel's findings may predetermine the outcome of a trial. *Id.* at 75; *see* Redish, "Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications," 55 *Tex.L.Rev.* 769, 792 (1977); Note, "Medical Malpractice Panels: A Constitutional Analysis," 46 *Fordham L.Rev.* 322, 331–32 (1977). We have recognized the importance of the recommendation by declaring that the physician panelist may be called as a witness at trial under *R.* 4:21–5(d) to challenge his credibility, interest or bias and the weight to be accorded the panel report. *Corbo v. Crutchlow,* 86 *N.J.* at 76.

In this case, plaintiffs did not object to Dr. Litzky serving as the panel-doctor, and did not call him as a witness at trial. Over objection, however, the trial court prohibited plaintiffs' counsel from mentioning in his opening statement that Dr. Litzky was the physician member of the panel and that he knew Dr. Pirozzi. The ruling further precluded plaintiffs' counsel from introducing into evidence the questionnaire answered by Dr. Litzky in which he stated that he had seen Dr. Pirozzi at professional meetings. In making its ruling, the trial court relied on *Evid.R.* 4, which authorizes a trial court, in its discretion, to exclude evidence if it finds that the probative value of the evidence "is substantially outweighed by the risk that its admission will either . . . necessitate undue consumption of time or . . . create a substantial danger of undue prejudice or of confusing the issues or of misleading the jury."

At the outset, we note that *R.* 4:21–5(a) does not prohibit the introduction of testimonial or documentary evidence showing bias of the panel-doctor. Indeed, if the defendants had called the panel-doctor as a witness at trial, plaintiffs' counsel could have pursued any possible bias on cross-examination. Further-

more, the rule would have allowed plaintiffs' counsel to call the panel-doctor. Plaintiffs' counsel asserts, however, he would have exposed his clients' case to undue risks if he had called the panel-doctor for the limited purpose of showing possible bias in favor of the defendant-doctors.

In view of the great weight apparently attached to the panel findings, either party must be permitted to show possible bias of a panel member. Accordingly, the questionnaires completed by physician panel members are admissible when relevant to the impartiality of the panel member and, thus, to the panel determination. From that perspective, our normal deference to the exercise of a trial court's discretion under *Evid.R.* 4 must yield to the right of a jury deciding a medical malpractice action to know of possible bias of a panel member in favor of one of the parties.

In addition, on remand the trial court should permit plaintiffs' counsel to attack the credibility of the defendant-doctor on the basis of prior inconsistent statements before the panel. A paramount purpose of cross-examination is the impeachment of the credibility of the witness. *McCormick, Evidence* (2d ed. 1972) § 22. Generally, any prior inconsistent statement, including an oral statement, may be used for impeachment. *McCormick, supra,* § 34 at 67 & n. 7; *see also N.J.Evid.R.* 22(b). Because no transcript is made of a panel hearing, no written record exists of a prior inconsistent statement. Cross-examination based on unrecorded testimony before a panel could deteriorate into an inconclusive shouting match. That risk can be reduced, if not eliminated, by the exercise of firm control by the trial court in balancing the need for effective cross-examination with the risk of unduly repetitive questioning. The confidentiality of a panel hearing, see *R.* 4:21–5(a), which prevents the introduction of testimony as substantive evidence, see *R.* 4:21–7, need not prevent cross-examination based on inconsistent statements before the panel. In this case, the trial court precluded plaintiffs' counsel from testing the

defendant-doctor's credibility by reference to alleged prior inconsistent statements before the panel. The effect of that preclusion was to deprive plaintiffs of a fundamental right inherent in a fair trial, the right to conduct an effective cross-examination of an adverse party.

The judgment below is reversed, and the matter remanded for a new trial in which plaintiffs may introduce evidence as to bias of the physician member of the *R.* 4:21 panel and also may cross-examine Dr. Pirozzi about prior inconsistent statements before the panel.

### III

In light of our ruling that plaintiffs must be allowed to offer evidence relevant to the bias of panel members, we find it unnecessary to decide whether the admission at trial of the panel determination imposes an unconstitutional burden on the right to trial by jury. As noted, the absence of a transcript of the panel proceedings creates difficulties for parties seeking to cross-examine the physician member of the panel or any other physician who testifies both before the panel and at trial. *See supra* p. 456. However, the absence of a transcript of the panel hearing is not tantamount in all cases to deprivation of the right to trial by jury. Although the absence of a transcript impairs the effectiveness of cross-examination based on a prior inconsistent statement made at a panel hearing, a party otherwise may embark on full scale cross-examination.

Further, we find to be without merit the contention that *R.* 4:21 improperly separates medical malpractice plaintiffs from the class of plaintiffs in negligence actions, thereby denying medical malpractice plaintiffs equal protection of law. Medical malpractice plaintiffs do not constitute a suspect category, *see State v. Senno,* 79 *N.J.* 216, 226 (1979); nor does a classification based on their status implicate a fundamental right or interest. *Id.* Thus, the classification at issue is valid if "it rests upon some ground of difference having a real and

substantial relation to the basic object of the legislation or some relevant consideration of public policy." *Guill v. Mayor & Council of Hoboken,* 21 *N.J.* 574, 582 (1956) (quoted with approval in *Hudson Circle Servicenter, Inc. v. Kearney,* 70 *N.J.* 289, 316–17 (1976)).

As noted previously, *R.* 4:21 was adopted to aid in the efficient administration of medical malpractice claims. *R.* 4:21–1. Generally those claims involve complex problems of proof and impose substantial burdens, in terms of both time and expense, on the parties and the court. Consequently, the classification of medical malpractice plaintiffs to establish procedures rationally related to the efficient administration of justice does not violate plaintiffs' right to equal protection. *See Suchit v. Baxt,* 176 *N.J.Super.* 407, 420–23 (Law Div.1980); *cf. Busik v. Levine,* 63 *N.J.* 351 (1973) (rule of procedure providing for prejudgment interest for tort claimants is constitutional although other successful claimants do not receive such interest); *Rybeck v. Rybeck,* 141 *N.J.Super.* 481 (Law Div.1976) (rational basis exists for treating automobile negligence claimants differently from other tort claimants).

From the date of its adoption in 1978, *R.* 4:21 has been the center of controversy about its fairness and effectiveness. In 1982 the Supreme Court Committee on Relations with the Medical Profession voted 10–6 to modify and continue the rule. That same year Chief Justice Wilentz appointed a Committee to Evaluate *R.* 4:21. The committee consisted of judges who have presided over *R.* 4:21 hearings, attorneys experienced in medical malpractice litigation, and physicians. In its report dated January 18, 1983, the committee unanimously concluded that the rule was ineffective and should not be retained in its present form. Furthermore, the committee found that it is problematic whether a panel hearing encourages the efficient disposition of medical malpractice claims. Some cases moved more quickly because of pre-trial screening, but others moved slowly and at greater expense. The committee determined that early preparation, rather than the mandatory panel procedure, is the reason for

more efficient case disposition. Therefore, the committee concluded that the key to more efficient administration of medical malpractice claims was not a mandatory panel procedure, but effective case management. The committee further recommended that the panel procedure be available to parties on a voluntary basis.

Even before the committee filed its report, Chief Justice Wilentz signed an order on December 7, 1982 that permits the suspension of *R.* 4:21 in Union and Burlington Counties in favor of individual case management of professional liability litigation. We continue to recognize that medical malpractice claims present special problems not only to the medical and legal professions, but to the judiciary and the public. Whether *R.* 4:21 should be revised or even retained is a matter that the Court will consider in due course after providing the bar and the public with the opportunity to submit comments concerning the committee's report.

## IV

We now address the nature of the claim resulting from the performance of the operation by a physician other than the one named in the consent form, so-called "ghost surgery." If the claim is characterized as a failure to obtain informed consent, the operation may constitute an act of medical malpractice; if, however, it is viewed as a failure to obtain any consent, it is better classified as a battery.

Informed consent is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him to "evaluate knowledgeably the options available and the risks attendant upon each" before subjecting that patient to a course of treatment. *Canterbury v. Spence,* 464 *F.* 2d 772, 780 (D.C.Cir.), *cert. den.,* 409 *U.S.* 1064, 93 *S.Ct.* 560, 34 *L.Ed.*2d 518 (1972); *see Calabrese v. Trenton State College,* 162 *N.J.Super.* 145, 156 (App.Div.1978), *aff'd,* 82 *N.J.* 321 (1980) (summary judgment for defendant-doctors reversed because of

fact question whether they disclosed dangerous side effects of drugs); *Kaplan v. Haines,* 96 *N.J.Super.* 242, 255–58 (App.Div. 1967), *aff'd o.b.,* 51 *N.J.* 404 (1968) (not error, in light of complete charge, to instruct jury that it should return verdict for defendants if patient "fully appreciated the danger involved in the operation"). *See generally Natanson v. Kline,* 186 *Kan.* 393, 350 *P.2d* 1093 (1960); M. Victor, "Informed Consent," 1981 *Med. Trial Tech. Q.* 138. Under the doctrine, the patient who consents to an operation is given the opportunity to show that the surgeon withheld information concerning "the inherent and potential hazards of the proposed treatment, the alternatives to that treatment, if any, and the results likely if the patient remains untreated." *Canterbury v. Spence, supra,* 464 *F.*2d at 787–88. If the patient succeeds in proving that the surgeon did not comply with the applicable standard for disclosure,[2] the consent is vitiated. *See Canterbury v. Spence, supra,* 464 *F.*2d at 782; 2 Louiselle and Williams, *Medical Malpractice* § 22.08 (1982).

In an action predicated upon a battery, a patient need not prove initially that the physician has deviated from a professional standard of care. Under a battery theory, proof of an unauthorized invasion of the plaintiff's person, even if harmless, entitles him to nominal damages. Prosser, *Law of Torts* § 9 at 35 (4th ed. 1971); *see Dow v. Kaiser Foundation,* 12 *Cal.App.*3d 488, 90 *Cal.Rptr.* 747, 758 (App.1970). The plaintiff

---

[2]Jurisdictions differ as to the standard to be applied when judging the adequacy of disclosure for informed consent purposes. Some courts have ruled that the standard is that of the "reasonably prudent medical practitioner acting under the same or similar circumstances," *see, e.g., Natanson v. Kline, supra;* others a standard based on community custom, *see, e.g., Tangora v. Matanky,* 231 *Cal.App.*3d 468, 42 *Cal.Rptr.* 348 (1965); and still others, the more recently developed standard of the reasonably prudent patient faced with making the decision to consent to or forego treatment, *see, e.g., Canterbury v. Spence, supra.* Under the latter standard, causation must also be shown: *i.e.,* that the prudent person in the patient's position would have decided differently if adequately informed. *Id.* at 791. *See generally* 2 Louiselle and Williams, *Medical Malpractice* § 22.08 (1982).

may further recover for all injuries proximately caused by the mere performance of the operation, whether the result of negligence or not. *See Pugsley v. Privette,* 220 *Va.* 892, 263 *S.E.*2d 69, 76 (Va.1980). *See generally* Prosser, *supra,* § 42. If an operation is properly performed, albeit by a surgeon operating without the consent of the patient, and the patient suffers no injuries except those which foreseeably follow from the operation, then a jury could find that the substitution of surgeons did not cause any compensable injury. Even there, however, a jury could award damages for mental anguish resulting from the belated knowledge that the operation was performed by a doctor to whom the patient had not given consent. Furthermore, because battery connotes an intentional invasion of another's rights, punitive damages may be assessed in an appropriate case. *Blackmore v. Ellis,* 70 *N.J.L.* 264, 265 (E. & A.1904); *Tiberi v. Petrella,* 60 *N.J.Super.* 513, 518 (App.Div.1960); *Kinikin v. Heupel,* 305 *N.W.*2d 589, 593 (Minn.1981).

The plaintiffs here do not challenge the adequacy of the disclosure of information relating to risks inherent in the operation performed. Nor do they contend that Mr. Perna would have decided not to undergo the operation if additional facts had been provided to him. In short, they concede Perna consented to an operation by Dr. Pirozzi. However, plaintiffs contend that two other surgeons operated on him without his consent. If that contention is correct, the operating surgeons violated the patient's right to control his own body. *See Right to Choose v. Byrne,* 91 *N.J.* 287, 306 (1982); *Schloendorff v. New York Hosp.,* 211 *N.Y.* 125, 105 *N.E.* 92, 93 (1914).

Any non-consensual touching is a battery. *See* Prosser, *Law of Torts* § 9. Even more private than the decision who may touch one's body is the decision who may cut it open and invade it with hands and instruments. Absent an emergency, patients have the right to determine not only whether surgery is to be performed on them, but who shall perform it. A surgeon who operates without the patient's consent engages

in the unauthorized touching of another and, thus, commits a battery. *See Cathemer v. Hunter,* 27 *Ariz.App.* 780, 558 *P.2d* 975 (App.1976) (reversing directed verdict for defendant-doctor where plaintiff charged that surgery involving right hip prosthesis instead of total hip replacement was a battery); *Dow v. Kaiser Foundation,* 12 *Cal.App.*3d 488, 90 *Cal.Rptr.* 747 (App. 1970) (reversible error by trial court in failing to charge that intentional concealment of risks of proposed surgery constitutes battery); *Krause v. Bridgeport Hosp.,* 169 *Conn.* 1, 362 *A.*2d 802 (1975) (affirming directed verdict for x-ray technicians where plaintiff did not allege or prove extension of contact needed to position plaintiff on x-ray table); *Mims v. Boland,* 110 *Ga.App.* 477, 138 *S.E.2d* 902 (App.1964) (consent to x-ray of colon prevented administration of barium enema from being a battery); *Perin v. Hayne,* 210 *N.W.2d* 609 (Iowa 1973) (where patient consented to one cervical vertebrae fusion, damage to laryngeal nerve while performing two fusions is not a battery); *Coppage v. Gamble,* 324 *So.2d* 21 (La.App.1975), *cert. den.,* 325 *So.2d* 819 (La.1976) (affirming judgment for podiatrist where patient consented to operation); *Gerety v. Demers,* 92 *N.M.* 396, 589 *P.2d* 180 (1978) (trial court verdict affirmed where physician performed an operation he had been specifically told not to perform, but plaintiff wrongly failed to allege battery); *Schloendorff v. New York Hosp.,* 211 *N.Y.* 125, 105 *N.E.* 92 (where patient was told she would be anesthetized for examination only, but was actually operated on, a battery was committed); *Congrove v. Holmes,* 37 *Ohio Misc.* 95, 308 *N.E.2d* 765 (Common Pleas 1973) (affirming summary judgment for plaintiffs where uncontroverted facts establish doctor failed to advise plaintiffs of risks of surgery); *Pugsley v. Privette,* 220 *Va.* 892, 263 *S.E.2d* 69 (1980) (where patient consented to operation on condition that another doctor also would be present and first doctor operated in absence of that doctor, the determination that the operation was not negligently performed was immaterial to the jury's consideration of the battery issue); I Louiselle & Williams, *Medical Malpractice* § 8.09 (1982); Prosser, *Law of Torts* § 18

at 104. A nonconsensual operation remains a battery even if performed skillfully and to the benefit of the patient. The medical profession itself recognizes that it is unethical to mislead a patient as to the identity of the doctor who performs the operation. American College of Surgeons, Statements on Principles, § I.A. (June 1981). Participation in such a deception is a recognized cause for discipline by the medical profession. *See* American College of Surgeons, Bylaws, art. VII, § 1(c) (as amended June 1976). By statute, the State Board of Medical Examiners is empowered to prevent the professional certification or future professional practice of a person who "[h]as engaged in the use or employment of dishonesty, fraud, deception, misrepresentation, false promise or false pretense ...." *N.J.S.A.* 45:1–21. Consequently, a statutory, as well as a moral, imperative compels doctors to be honest with their patients.

A different theory applies to the claim against Dr. Pirozzi. As to him, the action follows from the alleged breach of his agreement to operate and the fiduciary duty he owed his patient. With respect to that allegation, the Judicial Council of the American Medical Association has decried the substitution of one surgeon for another without the consent of the patient, describing that practice as a "deceit." [3] A patient has the right

---

[3]The Judicial Council of the American Medical Association has declared:

To have another physician operate on one's patient without the patient's knowledge and consent is a deceit. The patient is entitled to choose his own physician and he should be permitted to acquiesce in or refuse to accept the substitution. The surgeon's obligation to the patient requires him to perform the surgical operation: (1) within the scope of authority granted by the consent to the operation; (2) in accordance with the terms of the contractual relationship; (3) with complete disclosure of all facts relevant to the need and the performance of the operation; and (4) to utilize his best skill in performing the operation. It should be noted that it is the operating surgeon to whom the patient grants consent to perform the operation. The patient is entitled to the services of the particular surgeon with whom he or she contracts. The surgeon, in accepting the patient is obligated to utilize his personal talents in the performance of the operation to the extent required by the agreement

to choose the surgeon who will operate on him and to refuse to accept a substitute. Correlative to that right is the duty of the doctor to provide his or her personal services in accordance with the agreement with the patient. Judicial Council of the American Medical Ass'n, Op. 8.12 (1982).

██ Few decisions bespeak greater trust and confidence than the decision of a patient to proceed with surgery. Implicit in that decision is a willingness of the patient to put his or her life in the hands of a known and trusted medical doctor. Sometimes circumstances will arise in which, because of an emergency, the limited capacity of the patient, or some other valid reason, the doctor cannot obtain the express consent of the patient to a surrogate surgeon. Other times, doctors who practice in a medical group may explain to a patient that any one of them may perform a medical procedure. In that situation, the patient may accept any or all the members of the group as his surgeon. In still other instances, the patient may consent to an operation

creating the physician-patient relationship. He cannot properly delegate to another the duties which he is required to perform personally.

Under the normal and customary arrangement with private patients, and with reference to the usual form of consent to operation, the surgeon is obligated to perform the operation, and may use the services of assisting residents or other assisting surgeons to the extent that the operation reasonably requires the employment of such assistance. If a resident or other physician is to perform the operation under the guidance of the surgeon, it is necessary to make a full disclosure of this fact to the patient, and this should be evidenced by an appropriate statement contained in the consent.

If the surgeon employed merely assists the resident or other physician in performing the operation, it is the resident or other physician who becomes the operating surgeon. If the patient is not informed as to the identity of the operating surgeon, the situation is "ghost surgery." Judicial Council of the American Medical Ass'n, Op. 8.12 (1982); see also "Questions and Answers," 209 J.A.M.A. 947 (1969) (describing the performance of surgery by a resident operating under the supervision of a surgeon, but without the consent of the patient, as a fraud and deceit); American College of Surgeons, "Statements on Principles," § I.A. (June 1981) (it is unethical to mislead a patient as to the identity of the doctor who performs the operation).

performed by a resident under the supervision of the attending physician. The point is that a patient has the right to know who will operate and the consent form should reflect the patient's decision. Where a competent patient consents to surgery by a specific surgeon of his choice, the patient has every right to expect that surgeon, not another, to operate.

The failure of a surgeon to perform a medical procedure after soliciting a patient's consent, like the failure to operate on the appropriate part of a patient's body, is a deviation from standard medical care. It is malpractice whether the right surgeon operates on the wrong part or the wrong surgeon operates on the right part of the patient. In each instance, the surgeon has breached his duty to care for the patient. Where damages are the proximate result of a deviation from standard medical care, a patient has a cause of action for malpractice.[4] Although an alternative cause of action could be framed as a breach of the contract between the surgeon and the patient, generally the more appropriate characterization of the cause will be for breach of the duty of care owed by the doctor to the patient. The absence of damages may render any action deficient, but the doctor who, without the consent of the patient, permits another surgeon to operate violates not only a fundamental tenet of the medical profession, but also a legal obligation.

The judgment below is reversed and the matter remanded for trial consistent with our opinion. On remand, the court shall conduct a new pretrial conference at which all parties should

---

[4]Where the essence of a cause of action is an allegation of the failure to provide medical care or to provide that care properly, a plaintiff should couch the cause as malpractice. *Liebler v. Our Lady of Victory Hosp.,* 43 *A.D.2d* 898, 351 *N.Y.S.2d* 480 (App.Div.1978). If, however, a doctor has made a special agreement to perform medical services, in an appropriate case, an action might also be for breach of contract. *Id.; see Custodio v. Bauer,* 251 *Cal.App.2d* 303, 59 *Cal.Rptr.* 463 (App.1967); 61 *Am.Jur.2d* Physicians, Surgeons, Etc. § 161 (1981); 70 C.J.S., Physicians and Surgeons §§ 37–38 (1951); Annot., 99 *A.L.R.3d* 303 (1980). In this case, plaintiffs do not allege a breach of contract by defendants.

have the opportunity to amend their pleadings to conform to this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—6.

*For affirmance*—None.