709 A.2d 238

JEAN MATTHIES, PLAINTIFF–APPELLANT, v. EDWARD D. MASTROMONACO, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 10, 1997—Decided April 14, 1998.

574

Before Judges MUIR, Jr., KESTIN and CUFF.

*Arthur J. Messineo, Jr.*, argued the cause for appellant (*Messineo & Messineo*, attorneys; *Mr. Messineo*, on the brief).

*John D. North* argued the cause for respondent (*Greenbaum, Rowe, Smith, Ravin, Davis & Himmel*, attorneys; *Mr. North*, of counsel; *Mia L. Stuart*, on the brief).

The opinion of the court was delivered by

KESTIN, J.A.D.

Plaintiff appeals from a judgment of dismissal entered on a jury verdict of no cause for action, and from the trial court's denial of her motion for a new trial or for judgment notwithstanding the verdict. We reverse and remand for a new trial.

This is a medical malpractice action. Plaintiff alleges that defendant, an orthopedic surgeon, was negligent in treating a fractured right hip which plaintiff suffered in a fall in her home. Specifically, plaintiff contends, *inter alia*, that the trial court erred in its rulings on informed consent which not only disallowed plaintiff from arguing an independent, viable theory of negligence to the jury, but also placed unwarranted limitations on plaintiff's capacity to prove her basic medical malpractice case.

Plaintiff was eighty-one years of age at the time of her fall on August 26, 1990. She lived alone in a senior citizen residence. Her right leg was partially paralyzed as a result of a stroke in 1952 which had been caused by a blood clot resulting from a

mismatched blood transfusion. She wore a leg brace because she was unable to hold her foot in a horizontal position.

Following her fall, plaintiff could not get up or reach a phone. She was unattended for two days. After she was found and admitted to the hospital, plaintiff was severely dehydrated and had grossly distended bowels. X-rays revealed a fracture of her right hip, in respect of which defendant, an orthopedic surgeon, was called in on August 30 to consult on the case.

Based upon his review of the x-rays, defendant diagnosed plaintiff with a nondisplaced intracapsular fracture of the neck of the femur which had impacted on her right hip. He also noted, in addition to her dehydration and bowel problems, a right-side hemiparesis, defined in *Stedman's Concise Medical Dictionary* (2d Ed.1994) as "slight paralysis affecting one side of the body." Defendant learned of the latter condition from the medical history provided by plaintiff, who related that the condition had affected her upper and lower extremities since her stroke many years before. Defendant determined that because of plaintiff's partial paralysis and consequent lack of activity, her right leg muscles had deteriorated to the point where she could not contract them upon request, and her bones had become severely weakened and osteoporotic. Additionally, defendant observed that plaintiff's right arm and hand had been rendered almost useless through a combination of the partial paralysis, which had resulted in a ninety-degree contracture of her right elbow, and rheumatoid arthritis, which had so deformed her hand that she was unable to open it.

Defendant evaluated plaintiff's mobility prior to the accident and formed impressions of her ability to maintain an independent lifestyle. The latter subject became an issue in the case. Defendant testified that because of plaintiff's paralysis and generally weakened condition, she was unable to walk normally. He maintained that plaintiff could not generate any kind of propulsion from her right leg and hip, and instead had to use her leg as a post into which she would lean while swinging her good leg

forward. Defendant testified that based upon his conversations with plaintiff, he understood that while she had been capable of maneuvering around her closely confined apartment where she had things to hold on to, she had for a number of years relied upon a motorized scooter whenever she left the apartment.

Although experts for both sides agreed with defendant's assessment of plaintiff's limited ambulatory ability prior to her accident, plaintiff's daughter, Jean Kurzrok, testified that plaintiff had been entirely capable of caring for herself. Kurzrok related how, after being bedridden for an entire year after the stroke, plaintiff had managed to resume a normal life and care for her children. Kurzrok stated that plaintiff was able to walk, albeit with a leg brace and a limp, and that problems with her right arm eventually waned. It was only many years later, well after plaintiff moved into the senior citizen residence, that she found it necessary to rely upon a three-wheel electric scooter whenever she went outdoors. Kurzrok insisted that, until the fall, her mother could walk about her own apartment. She was of the opinion that her mother's leg brace was not really necessary but was worn as "a security blanket ... or a matter of habit."

Kurzrok described her mother as a woman who "loved her independence." She stated that, while at the senior citizen residence, plaintiff washed and dressed herself, made her own bed, prepared her own food and did her own housework, laundry and light shopping. Plaintiff's friend, Madeline Quinlan, confirmed that plaintiff was largely capable of caring for herself, although she noted that plaintiff received one meal a day from Meals on Wheels.

Quinlan also believed that plaintiff did not need the scooter when moving throughout the building in which she resided. Plaintiff's dentist from 1981 to 1990, Arthur Massarsky, noted that over the years he had observed her climb the stairs to his second floor offices using a cane.

By the time of trial, plaintiff suffered from periodic disorientation and confusion; she was too ill to testify. Accordingly, por-

tions of her deposition were read into evidence. Plaintiff testified that prior to her accident she was unable to walk without her leg brace because she had only sporadic feeling in her right leg. She stated that she could move her leg only when the brace was on. According to plaintiff, while she did her own housework, she could not go up a ladder or get down on the floor. She used a cart to transport her laundry while riding on her scooter. She could not get into her bathtub, so she washed herself at the sink. Although she did not use her scooter in the apartment, she always used it when she left the apartment, even to visit friends in the building.

Defendant testified that he made his treatment decisions after assessing plaintiff's physical condition. His goal was to provide plaintiff with a leg that could still function as a post and allow her to stand and to move from bed to a chair or to the bathroom. Because plaintiff's fracture was intracapsular, *i.e.*, inherently stable due to the fact that the broken pieces were both contained and held together by the rubbery tissue of the capsule, defendant believed that there was a possibility that this goal could be met without surgical intervention. Although defendant knew that the standard procedure in such instances was to "pin" the fracture in order to prevent its displacement, defendant did not believe that plaintiff's bones were strong enough to withstand the insertion of four stainless steel screws without coming apart. The screws were described as being an eighth- to quarter-inch in thickness and about four inches in length.

Defendant further testified that if the pinning failed, it was likely that the pins would escape the capsule, "caus[ing] tremendous pain." According to defendant, immediate surgery would then be necessary to remove the pins, followed by a partial or full hip replacement. With either of these procedures, many complications could occur such as adverse reaction to anesthesia, blood clotting, dislocation, or fractures to the weak bone below the prosthesis.

Given plaintiff's frail condition, defendant decided that the better course of action would be to try to avoid complications that

would lead to progressively more intrusive surgeries. He opted to proceed with a program of simple bed rest in order to avoid displacement and promote healing. He knew that displacement was likely to occur, resulting in a slight shortening of plaintiff's leg, but he believed that this would not be a serious problem in light of the fact that her foot already hung down. He believed that if all went well, plaintiff would have the same limited mobility as she had had before, utilizing the same walking aids. Defendant believed that there was no way plaintiff was going to get the leg she wanted, nor any way that she would be able to resume living independently.

He testified:

[T]here were no risks really. She could ... be the same thing after the conservative therapy was over than [sic] she could before. She'd still have limited ability to ambulate. I'm not going to give her that leg she wanted. She wanted to live alone, but she couldn't live alone. It was detrimental to her to live alone. She could get up, but she couldn't walk on the avenue. I wasn't asking her that. I wanted her to be at peace with herself in the confines of professional care, somebody to care for her. She could not live alone.

According to defendant, he discussed his recommended treatment approach with plaintiff, and told her that he did not believe that she was a candidate for surgery at the time. He testified that plaintiff expressed some concern about blood transfusions and stated that she did not want to undergo surgery. Defendant stated that plaintiff appeared to be in possession of her faculties; and Kurzrok acknowledged during her testimony that her mother was fully capable of, and had, in fact, made the decision to follow defendant's recommendations. Defendant testified that he also spoke with plaintiff's family regarding her care and expressed his opinion that plaintiff should be placed in a situation where she would have twenty-four-hour care.

Kurzrok testified that she had received a phone call from defendant who informed her that plaintiff had a "slight" crack in her right hip, and advised bed rest in the hopes that it would heal itself. Kurzrok stated that defendant asked no questions about plaintiff's ability to live independently; and her impression was that, upon healing, all would be fine. According to Kurzrok, she

and defendant did not speak about placing plaintiff in a nursing home. Kurzrok testified that defendant never informed her of the attendant risks of displacement, loss of leg length, or non-recovery from the course of treatment he recommended; nor did he indicate that plaintiff needed surgery. Kurzrok contended that defendant had not conveyed to her an accurate picture of the condition of plaintiff's hip. She testified that defendant told her the fracture could be pinned, but that this surgery was elective and could be done in the future. He stated to her that plaintiff had informed him that she did not want surgery.

Kurzrok visited her mother every day and noted that, after the first few days, nurses regularly assisted plaintiff out of her bed and into a chair. Plaintiff complained constantly of hip pain. Kurzrok called defendant to relate this information. Defendant told her he would call her back after he had had a chance to review plaintiff's latest x-rays. Kurzrok testified that, during their subsequent conversation, defendant stated that "there had been a slight shift in the crack, and he could kick himself for not putting a pin in right away." Nonetheless, defendant ordered a continuous program of bed rest, which prevailed until his involvement with plaintiff's care ended upon her discharge from the hospital on October 11, 1990.

Defendant testified that he had waited several days before ordering new x-rays because he wanted to evaluate the stability of the fracture after plaintiff made it out of bed. He acknowledged that he had expressed regret to Kurzrok, after discovering the displacement, that he had not put a pin in, but stated that he was merely expressing his frustration over not having been able to help plaintiff either with or without surgery. He believed, nevertheless, that his goal of making plaintiff minimally ambulatory could still be accomplished with continued conservative care. Defendant realized that many orthopedic surgeons would have operated immediately once the displacement occurred, but he believed, given plaintiff's overall condition and the likelihood of complications, that surgery should be avoided as long as possible, especial-

ly where there was every reason to think that plaintiff could still become minimally ambulatory on her own.

After her discharge from the hospital on October 11, 1990, plaintiff was transferred to an intermediate care center where she was expected to receive physical therapy. This therapy was eventually ordered in late 1990 by plaintiff's succeeding orthopedist. Throughout 1991, while plaintiff was still at the intermediate care center, she saw a number of other orthopedists. During her time there she was also treated for depression. By the end of 1991, plaintiff was unable to straighten her right knee and she was diagnosed with contractures of the knee. In February 1992, surgery was performed on plaintiff to release those contractures. Her therapy continued until her release from the intermediate care center in January 1993, after more than two years.

Plaintiff was then admitted to a nursing home, where her therapy was continued. Two-and-one-half additional years passed and, in June 1995, plaintiff underwent a full hip replacement. She suffered complications from this procedure, and almost died. The problems included massive blood clotting requiring the insertion of a blood filtering device, toxic encephalopathy, a urinary tract infection, and a secondary infection which resulted in massive diarrhea caused by a necessary antibiotic. Eventually plaintiff returned to the nursing home, but still could not walk.

Later the same year, plaintiff's leg broke beneath her prosthesis and she was rehospitalized for additional surgery. Kurzrok testified that, at the time of trial, plaintiff was withdrawn, forgetful and easily confused. Although she could operate her scooter on the nursing home floor, she required assistance to get out of bed, dress, go to the bathroom, or bathe.

Plaintiff's expert, Dr. Hervey S. Sicherman, a board-certified orthopedic surgeon, testified that defendant had deviated from the standard of care by failing to pin plaintiff's fracture immediately in order to ensure its stability. According to Sicherman, neither plaintiff's age nor the fact that she was osteoporotic contraindicated surgery. He asserted that pins do not dislodge because of

osteoporosis, but rather because of "the nature of the fracture and the amount of forces on the hip joint in there." He believed that pinning would probably have restored plaintiff to her prior condition. In Sicherman's opinion, defendant should have tried to avoid further disadvantage to his partially paralyzed patient by preventing any shortening of her leg.

Sicherman opined further that a non-operative course of treatment should be attempted only with strong patients who can endure traction. Nevertheless, once plaintiff had begun this course of treatment, she should not have been allowed out of bed; and x-rays should have been performed as soon as she complained of pain. Sicherman believed that defendant's failure to impose necessary restrictions upon plaintiff's movement resulted in the displacement of her fracture. He further believed that once displacement had occurred, defendant should have immediately performed a hemiarthroplasty, a partial hip replacement. He stated that, with an elderly patient, it is always better to operate sooner, rather than later.

Sicherman believed that the development of contractures of the hip by late 1990, and of the knee by late 1991, resulted from the course defendant had undertaken to treat plaintiff's fracture, which left her unable to move and allowed her muscles, tendons and ligaments to stiffen and contract. He was of the opinion that the failure to pin the fracture resulted in plaintiff's need for a full hip replacement in 1995; and that her inability to walk afterwards was the result of nerve damage sustained during her protracted period of immobility and the resultant surgery to release the knee contractures. In sum, plaintiff's then current inability to walk and the need for her to have become institutionalized were, in Sicherman's estimation, caused by defendant's deviations.

Sicherman also testified that defendant's decision to follow a non-operative course of treatment with plaintiff did not render her an unsuitable candidate for later hip surgery. He acknowledged that plaintiff remained a candidate for either a partial or full hip replacement in December 1990 when she was no longer under

defendant's care. He also stated that the subsequent contractures in her hip and knee did not rule out a partial hip replacement.

Defendant's expert, Dr. Ira A. Roschelle, a board-certified orthopedic surgeon, testified to his view that a patient's overall physical condition is vitally important in making the decision whether or not to operate. He stated that because plaintiff had sustained an inherently stable intracapsular fracture, healing without surgical intervention was possible provided there was no movement at the fracture site.

Roschelle believed that surgery was not mandated in plaintiff's case because she was already significantly impaired and did not require a perfectly aligned leg to use the leg as a post, as she had done before. He also noted that surgery would have placed plaintiff at risk due to her poor health. He testified that it is acceptable under the prevailing standard of care to treat a patient without surgery in order to avoid harming the patient. Roschelle agreed that, had plaintiff been generally healthy, the proper course would have been to pin the fracture.

Although Roschelle acknowledged that pinning could have increased the chances of non-displacement, he opined that plaintiff's osteoporosis raised a valid concern as to whether her bones could withstand the insertion of four pins. Roschelle noted that pinning fails sixty percent of the time due to such complications as loss of fixation, failure to heal, and loss of blood supply to the joint. When pinning fails, either partial or full hip replacement is necessary. Risks of hip replacement surgery include blood clots and bowel problems. Patients without normal muscle control, such as plaintiff, also run the risk of dislocation.

Roschelle opined that defendant was not to blame for the subsequent partial displacement of plaintiff's fracture. He testified that traction had not been necessary and that defendant had sufficiently monitored plaintiff's progress. He stated that there were no instructions which defendant could have given to the hospital staff to avoid displacement. Fractures of this type take

four to six months to heal and patients must move out of their beds.

Roschelle noted that defendant could still have decided to pin the fracture or replace plaintiff's hip once the displacement occurred. This would have been the usual course with a healthy patient, but he observed that defendant's decision not to operate was supported by plaintiff's medical problems and by the fact that the fracture remained intracapsular and healing could still have occurred. Roschelle stated further that defendant's conservative treatment approach did not preclude the possibility of a partial or full hip replacement at a later date, and that any one of plaintiff's subsequent orthopedists could have performed those surgeries.

Roschelle testified that plaintiff's knee contractures, which developed halfway into her stay at the intermediate care center, could not have been avoided even if defendant had pinned the fracture. In Roschelle's opinion, these contractures were the result of plaintiff's paralysis and rheumatoid arthritis. He believed them to have caused much of the apparent shortening of plaintiff's leg, noting that the implant plaintiff received in 1995 was of normal size. He also opined that defendant was in no way responsible for the fact that plaintiff ultimately received a full rather than a partial hip replacement.

From the beginning of the trial, plaintiff sought to have the issue of informed consent placed before the jury. The trial judge ruled that the issue was not part of the case. Plaintiff was prohibited from cross-examining defendant relative to it and from establishing a predicate for any such argument in the testimony of her own experts. Prior to jury selection, plaintiff argued that defendant had not only failed to "use proper care in the management of [the] ... conservative [course of] treatment" he had selected for plaintiff, but that he had also violated his legal duty in making the decision to treat plaintiff conservatively, *i.e.*, nonsurgically, without providing sufficient information about alternative treatment options and the benefits and risks associated with each, so that plaintiff herself, on a fully informed basis, would be

in a position to select a course of treatment from the choices available. Plaintiff argued that the failure to provide sufficient information upon which informed consent could be based occurred twice: first, when defendant decided upon a "conservative," *i.e.*, non-surgical, course of treatment initially and, once more, when displacement occurred and a surgical option was again rejected.

Plaintiff argued:

[Defendant] acknowledge[s] that there are two methods, at least at this point, of treating this undisplaced impacted fracture of the right femur. One is the conservative approach, and the other is by pinning.

\* \* \*

[Plaintiff] was not informed of the majority school, and the majority school held that this hip should be pinned. She was not informed of that option.

In addition to that, she was not given the benefits and risks of one over the other. She was not told ... that one of the benefits of operating ... that is, pinning it, ... would be ..., in all probability, that the neck would not go on to displacement.

More importantly, what she was not told ..., by going ahead with this conservative treatment, ... is that this neck of the femur without being pinned would go on to displacement. [Defendant] in his deposition says to us that he expected it to be displaced even with the method of his treatment, but he never tells the patient.

Number two, he fails to tell the patient by this conservative method that the right appendage will be at least two inches shorter than her left appendage. He does not tell her ... that she will limp. And, more importantly, he does not tell her ... that one of the risks of not operating on her at that time ... is that she will be confined and dependent upon others for the rest of her life. She will only have the mobility of getting out of bed to a wheelchair by use of a walker, and a walker to the commode, a complete and substantial change in her quality of life. She was never given that information[.]

Now, we take the next situation. The fracture goes on to displacement, as the doctor anticipated it would, and says to ... the daughter, once it went on to displacement, I could have kicked myself for not hav[ing] pinned the fracture. Now, once it's in displacement, as to medical malpractice deviation, it is our contention that there is only one way of treating this, not a judgment call, only one way of treating it, and that's open reduction and inserting a prosthesis to bring proper alignment into ... this deformed limb, because now we have that fracture. We have the neck of the femur stuck up in the acetabulum. And now we have the fracture, proximal portion of the femur sticking up out of the socket....

And the doctor recommends conservative treatment—that is, once again, do absolutely nothing—and says to her and the daughter, well, surgery maybe can be done at some other time.

Our contention simply is at this juncture there's only one thing to be done, and that is to operate. He states it in the record, that the X-ray films taken on the 6th, read by him on the 7th, indicate by X-ray open reduction, internal fixation. * * *

Now, once this goes on to displacement, according to him, there are two options of treatment. The one option is do nothing. The other option is surgical reduction maybe at some later time.

Now, at this point, neither the patient nor her daughter ... were ever told about the risks and benefits of the two options at that time. They were not told that by doing nothing and following this ... conservative method of treatment ... the right appendage would be ... approximately two-inches shorter than the left. It would be substantially shorter. And that without a doubt, she will limp. Without a doubt, she will no longer be able to function independently as she did before.

He knew and did not tell her that she would be confined to a wheelchair, confined to a bed, and would only be able to ambulate ... from point to point, that is, from the bedroom to the bathroom and the bathroom to her ... wheelchair, by use of a walker, a substantial change in the quality of her life that she enjoyed when she was 81–years old.

He knew and failed to tell.... [S]he would not ... ever, ever be able to live alone. She would always need a caretaker. She would be confined to a nursing home for the rest of her life if we choose the conservative method.

On the other hand, with regard to open reduction and internal fixation, it is our contention he did not tell her of the benefits of that ... treatment, that is, operating ... would, once again, provide her with a stable platform. Even though she had right-sided paresis, she was able to ambulate. And putting the hip back in the proper anatomical alignment would have permitted her to gain the function that she had before. This ... was not told to the patient. So the patient on two points, the time where the option of surgery or not before it was displaced, the two options of conservative treatment vis-a-vis operative treatment, and then again after displacement, two methods of treatment, conservative treatment or operative treatment, the risks and benefits of those were never supplied to this woman. Therefore, at no time was she able to make an informed decision as to which of these two avenues of treatment she wished to choose. That has been deprived of her.

The doctor goes on to say, with regard to the displacement of the fracture, that while it's true he recommended conservative treatment, it is also true, he says, I told her maybe she could do it sometime in the future. As to that, there's an additional part of the informed consent, because it's uncontroverted by our medical expert, as well as the defense medical expert, that the best time to reduce this is at the time she was in the hospital. And as time goes on, after she is discharged and placed in the nursing home, there are substantial risk factors in delaying the operation—scar contractures, muscle contractures—all of which came to fruition in this case.

... [A]s to informed consent, if he is saying, Look Mrs. Matthies, in my opinion, we don't have to do anything now, but ... later on, Mrs. Matthies, we can do it or someone else can do it, then you have to tell the patient who is making this ... ["]informed decision.["] If I'm going to have it done in the future, when is the

future? When is this election? Is it next week? Is it next month? Is it a year from now? And what complications can come about so, once again … the patient [ ] can make an intelligent decision. [Plaintiff] was never given the benefit of that information to make any informed decision.

Plaintiff then went on to argue that, as a matter of law, the concept of informed consent was not limited to the performance of surgical procedures, but rather bore upon all treatment options, including the choice to forego surgery in favor of more "conservative" approaches. Plaintiff contended that the decision to elect from two or more choices of treatment was for the patient to make, not the physician; and that the physician owed the patient a duty to disclose such information, including that relating to the benefits, risks, and prognoses associated with each option, which would enable the patient to make a reasonably informed choice of treatment.

Defendant argued in response:

that the doctrine of informed consent only applies when there is going to be some type of invasion into the plaintiff's body. There are no reported cases … where any court has held that the doctrine of informed consent applies in a case where a doctor has elected not to perform surgery.

\* \* \*

The reason for informed consent is the patient must decide, in effect, whether I'm going to cross the Rubicon or consent to a procedure that can't be undone. And that's why before a doctor proceeds with that type of treatment, the consent of the patient must be obtained. The doctrine can't apply in a case where the doctor has reviewed for himself the various alternatives that might be applied, ruled out surgery as a form of acceptable or proper treatment for a patient, and decided on a nonsurgical course of treatment. If that were the case, then every medical decision that's made would require the informed consent of the patient.

\* \* \*

If [plaintiff's] argument is correct and the patient says, I refuse to undergo conservative treatment, then you would have a situation where [defendant] would be compelled, I suppose, to perform surgery.

If the plaintiff's argument were correct, the plaintiff by saying, I don't want to undergo conservative treatment, would be compelling the doctor to perform a surgery that he didn't think was appropriate. \* \* \* The plaintiff's case is that [defendant] was confronted with a choice between two recognized means of

treatment. He decided that one was not indicated and that he should not follow one in this case, and instead, followed another. That's a medical judgment.

The plaintiff's case is the judgment was negligent. That's their case. But every time a physician decides upon a course of treatment doesn't require the patient to agree to consent to that, and, in effect, exercise a veto power and compel the doctor to perform an alternative method of treatment that he's decided shouldn't be performed on that particular patient. I don't think that doctrine of informed consent can apply in a case where the physician has decided surgery is not indicated.

With the contending positions of the parties thusly well-framed, the trial judge went on to rule:

In *In re Conroy*, 98 *N.J.* 321, 486 *A.2d* 1209, the Supreme Court discusses consent, [including] the performance of surgery without consent as being an assault. They go on say that:

"The doctrine of informed consent is a primary means developed in the law to protect this personal interest in the integrity of one's body. 'Under this doctrine, no medical procedure may be performed without a patient's consent obtained after explanation of the nature of the treatment, substantial risks and alternative therapies.' " [citations omitted] * * * ('Absent an emergency, patients have the right to determine not only whether surgery is to be performed on them, but who shall perform it.') [Quoting from *Perna v. Pirozzi*, 92 *N.J.* 446, 461, 457 *A.2d* 431 (1983) ]." [*In re Conroy, supra*, 98 *N.J.* at 346-47, 486 *A.2d* 1209.]

I have always considered the doctrine of informed consent to apply to affirmative acts, that is, the performance of surgery or some other physical procedure on the plaintiff's body, not the failure to operate. The case which changed the approach to informed consent is *Largey v. Rothman* 110 *N.J.* 204, 540 *A.2d* 504.

On page 207, they start to discuss the history of the doctrine. And the origins go back at least two centuries, and they cite an English case. And then they are discussing a New York case in which Justice Cardozo announced, "A patient's right to be free of uninvited, unknown surgery which constitutes a trespass on the patient." And they go into language which says that, "A surgeon who performs an operation without his patient's consent commits an assault."

So as I understand the doctrine of informed consent, it has to do with affirmative acts in the performance of procedures on a patient's body. The old doctrine was that it was an assault if it was done without consent.

We have one case in New Jersey, the name of which escapes me, which says that failure to obtain informed consent is really a violation of standards. It's not an assault.... [S]o I don't see the doctrine of informed consent being applicable in a case where the surgery is not done.

A doctor may decide to give a patient an antibiotic, and there may be six or seven possible antibiotics to be given. Most of these have known side effects. Is the antibiotic the choice of the patient? I don't think so. I think the doctor, in deciding on a particular form of antibiotic, may have a duty to warn the patient of

the possible side effects, but I don't know that under our law the doctor has a duty to go through the whole *PDR* with the patient.

* * *

[T]his is a straight medical negligence case. It is not a case involving a lack of informed consent. It appears to me that when you don't have the performance of the surgery, that doctrine does not come into play. I don't think that I as a trial judge have the right to expand the law. I think the guidelines are there in the appellate decisions and they are binding on me.

This ruling was reiterated later in the trial.

In the light of prevailing standards governing informed consent, the trial judge's ruling was unduly narrow and restrictive. It evinced a misreading of *Largey v. Rothman* and a misunderstanding of its significance.

The trial judge correctly summarized the historical origins of the concept of informed consent as based upon the requirement "that a physician [must] obtain the patient's consent before surgery," *see Largey v. Rothman*, 110 *N.J.* 204, 207, 540 *A.2d* 504 (1988), but he failed to appreciate that the Supreme Court in *Largey* adopted an expanded formulation rooted in negligence and keyed to the idea

that the proper standard is one that focuses not on what information a reasonable doctor should impart to the patient (the "professional" standard) but rather on what the physician should disclose to a reasonable patient in order that the patient might make an informed decision (the "prudent patient" or "materiality of risk" standard).

[*Id.* at 206, 540 *A.2d* 504.]

After alluding to historic approaches regarding consent to perform surgery, which were premised upon notions of trespass, assault, and battery, *id.* at 207–08, 540 *A.2d* 504, the Court went on to observe:

Although the requirement that a patient give consent before the physician can operate is of long standing, the doctrine of *informed* consent is one of relatively recent development in our jurisprudence. It is essentially a negligence concept, predicated on the duty of a physician to disclose to a patient such information as will enable the patient to make an evaluation of the nature of the treatment and of any attendant substantial risks, *as well as of available options in the form of alternative therapies.*

[*Id.* at 208, 540 *A.*2d 504 (citations omitted) (initial emphasis in original; latter emphasis added).]

The Court discussed this newly emerging concept in a context broader than surgery alone, notwithstanding that the case itself involved surgical procedures.

In articulating its formulation, the Court explicitly abrogated the earlier " 'professional' standard" which governed, *i.e.*, "what a reasonable medical practitioner of the same school and same or similar community" would have disclosed, *Kaplan v. Haines*, 96 *N.J.Super.* 242, 257, 232 *A.*2d 840 (App.Div.1967), *aff'd o.b.*, 51 *N.J.* 404, 241 *A.*2d 235 (1968), and substituted the "prudent patient" or "materiality of risk" standard framed in *Canterbury v. Spence*, 464 *F.*2d 772 (D.C.Cir.), *cert. denied*, 409 *U.S.* 1064, 93 *S.Ct.* 560, 34 *L. Ed.*2d 518 (1972). *Kaplan v. Haines* was expressly overruled. *Largey v. Rothman, supra*, 110 *N.J.* at 213, 540 *A.*2d 504. The newly adopted test, one for jury application,

announced a duty on the part of a physician to "warn of the dangers lurking in the proposed treatment" and to "impart information [that] the patient has every right to expect," as well as a duty of "reasonable disclosure of the choices with respect to proposed therapy and the dangers inherently and potentially involved." [*Canterbury v. Spence, supra*, 464 *F.*2d] at 782. The [*Canterbury*] court held that the scope of the duty to disclose

"must be measured by the patient's need, and that need is the information material to the decision. Thus the test for determining whether a particular peril must be divulged is its materiality to the patient's decision: all risks potentially affecting the decision must be unmasked. And to safeguard the patient's interest in achieving his own determination on treatment, the law must itself set the standard for adequate disclosure." [*Id.* at 786–87 (footnotes omitted.) ]

The breadth of the disclosure of the risks legally to be required is measured, under *Canterbury*, by a standard whose scope is "not subjective as to either the physician or the patient," *id.* at 787; rather, "it remains *objective* with due regard for the patient's informational needs and with suitable leeway for the physician's situation." *Ibid.* (emphasis added). A risk would be deemed "material" when a reasonable patient, in what the physician knows or should know to be the patient's position, would be "likely to attach significance to the risk or cluster of risks" in deciding whether to forego the proposed therapy or to submit to it. *Ibid.* [*Largey v. Rothman, supra*, 110 *N.J.* at 211–12, 540 *A.*2d 504.]

Among the rationales for the adoption of the "prudent patient" standard which the Court found persuasive were those recited in 2

D. Louisell and H. Williams, *Medical Malpractice,* § 22.12 at 22–45 to 47 (1987) (Louisell and Williams):

(1) The existence of a discernible custom reflecting a medical consensus is open to serious doubt. The desirable scope of disclosure depends on the given fact situation, which varies from patient to patient, and should not be subject to the whim of the medical community in setting the standard.

(2) Since a physician in obtaining a patient's informed consent to proposed treatment is often obligated to consider non-medical factors, such as a patient's emotional condition, professional custom should not furnish the legal criterion for measuring the physician's obligation to disclose. Whether a physician has conformed to a professional standard should * * * be important [only] where a pure medical judgment is involved, *e.g.* in ordinary malpractice actions, where the issue generally concerns the quality of treatment provided to the patient.

(3) Closely related to both (1) and (2) is the notion that a professional standard is *totally* subject to the whim of the physicians in the particular community. Under this view a physician is vested with virtually unlimited discretion in establishing the proper scope of disclosure; this is inconsistent with the patient's right of self-determination. As observed by the court in *Canterbury v. Spence:* "Respect for the patient's right of self-determination * * * demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves."

(4) The requirement that the patient present expert testimony to establish the professional standard has created problems for patients trying to find physicians willing to breach the "community of silence" by testifying against fellow colleagues.

[quoted in *Largey v. Rothman, supra,* 110 *N.J.* at 212–13, 540 *A.*2d 504.]

## The Court in *Largey* went on to observe:

[W]e are entirely unimpressed with the argument, made by those favoring the "professional" standard, . . . that the "prudent patient" rule would compel disclosure of *every* risk (not just *material* risks) to *any* patient (rather than the *reasonable* patient). As *Canterbury* makes clear,

"[t]he topics importantly demanding a communication of information are the inherent and potential hazards of the proposed treatment, the alternatives to that treatment, if any, and the results likely if the patient remains untreated. The factors contributing significance to the dangerousness of a medical technique are, of course, the incidence of injury and the degree of harm threatened." [464 *F.*2d at 787–88.]

The court in *Canterbury* did not presume to draw a "bright line separating the significant [risks] from the insignificant"; rather, it resorted to a "rule of reason," *id.* at 788, concluding that "[w]henever non-disclosure of particular risk information is open to debate by reasonable-minded men, the issue is one for the finder of facts." *Ibid.* The point assumes significance in this case because defendant argues that the risk of lymphedema from an axillary node biopsy is remote, not material. Plaintiff's experts disagree, contending that she should have been informed of that risk. Thus there will be presented on the retrial a factual issue for the jury's

resolution: would the risk of lymphedema influence a prudent patient in reaching a decision on whether to submit to the surgery?

[*Largey v. Rothman, supra*, 110 *N.J.* at 213–14, 540 *A.*2d 504.]

It is beyond question that the Supreme Court in *Largey* adopted a new standard of informed consent. It is equally clear that that standard was based primarily upon maturing concepts of patient autonomy and individual self-determination which underlie legal rules governing medical treatment and personal care in a variety of situations. *See In re Conroy*, 98 *N.J.* 321, 347, 486 *A.*2d 1209 (1985) (right to die); *see also, e.g., In re M.R.*, 135 *N.J.* 155, 166–67, 170, 638 *A.*2d 1274 (1994) (as applied to a developmentally-disabled person); *Hennessey v. Coastal Eagle Point Oil Co.*, 129 *N.J.* 81, 112–14, 609 *A.*2d 11 (1992) (addressing personal autonomy as based upon both the constitutional right of privacy and the common law right of self-determination); *In re Jobes*, 108 *N.J.* 394, 399, 529 *A.*2d 434 (1987) (right to die); *id.* at 432–33, 529 *A.*2d 434 (Handler, J., concurring); *id.* at 448, 529 *A.*2d 434 (Pollock, J., concurring); *Procanik v. Cillo*, 97 *N.J.* 339, 364, 478 *A.*2d 755 (1984) (Handler, J., concurring and dissenting) (implicating physician's obligation to diagnose and disclose information bearing upon possible termination of pregnancy); *In re Grady*, 85 *N.J.* 235, 248, 426 *A.*2d 467 (1981) (reproductive rights).

Perhaps the strongest consideration that influences our decision in favor of the "prudent patient" standard lies in the notion that the physician's duty of disclosure "arises from phenomena apart from medical custom and practice": the patient's right of self-determination. *Canterbury, supra*, 464 *F.*2d at 786–87. The foundation for the physician's duty to disclose in the first place is found in the idea that "it is the prerogative of the patient, not the physician, to determine for himself the direction in which his interests seems to lie." *Id.* at 781. In contrast the arguments for the "professional" standard smack of an anachronistic paternalism that is at odds with any strong conception of a patient's right of self-determination. *Id.* at 781, 784, 789.

[*Largey v. Rothman, supra*, 110 *N.J.* at 214, 540 *A.*2d 504.]

*See also Niemiera v. Schneider*, 114 *N.J.* 550, 565 n. 4, 555 *A.*2d 1112 (1989) (observing that *Largey* "established that the standard of informed consent related to the patient's needs, not the physician's judgment"); *In re Conroy, supra*, 98 *N.J.* at 347, 486 *A.*2d 1209 ("The doctrine of informed consent presupposes that the

patient has the information necessary to evaluate the risks and benefits of all the available options and is competent to do so. * * * In general, it is the doctor's role to provide the necessary medical facts and the patient's role to make the subjective treatment decision based on his understanding of those facts. * * * The patient's ability to control his bodily integrity through informed consent is significant only when one recognizes that this right also encompasses a right to informed refusal. * * * Thus, a competent adult person generally has the right to decline to have any medical treatment initiated or continued." (citations omitted)).

■■■■ Since *Largey*, we have viewed the doctrine of informed consent to be applicable in instances where the patient "declines the treatment recommended by the doctor" as well as "in cases in which the patient has undergone the treatment proposed by the physician." *Battenfeld v. Gregory*, 247 *N.J.Super.* 538, 551, 589 *A.*2d 1059 (App.Div.1991). We have held specifically that "a physician may be held liable for withholding information concerning the potential harm likely to result if the patient remains untreated." *Id.* at 550, 589 *A.*2d 1059.

> Informed consent is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him to consider and weigh knowledgeably the options available and the risk attendant to each. *Perna v. Pirozzi*, 92 *N.J.* 446, 459, 457 *A.*2d 431 (1983). Under the doctrine, the patient who consents to an operation is given the opportunity to show that the physician withheld information concerning the inherent and potential hazards of the proposed treatment, the alternatives, if any, and the results likely if the patient refuses the prescribed course. *Id.* at 460, 457 *A.*2d 431. The breadth of the disclosure of the risks legally required is measured by a standard whose scope is "not subjective as to either the physician or the patient." *Largey v. Rothman*, 110 *N.J.* 204, 211, 540 *A.*2d 504 (1988), quoting *Canterbury v. Spence*, 464 *F.*2d 772, 787 (D.C.Cir.1972), *cert. denied*, 409 *U.S.* 1064, 93 *S.Ct.* 560, 34 *L.Ed.*2d 518 (1972). It remains objective with due regard to the patient's needs and with suitable leeway for the physician's situation. *Ibid.* The test for determining "whether a particular peril must be divulged is its materiality to the patient's decision: all risks potentially affecting the decision must be unmasked." *Id.* 110 *N.J.* at 211, 540 *A.*2d 504, quoting *Canterbury*, 464 *F.*2d at 786–87. "A risk would be deemed 'material' when a reasonable patient, in what the physician knows or should know to be the patient's position, would be 'likely to attach significance to the risk or cluster of risks' in deciding whether to forego the proposed therapy or to submit to it." *Ibid.*
>
> [*Battenfeld v. Gregory, supra*, 247 *N.J.Super.* at 550–51, 589 *A.*2d 1059.]

*See also Kimmel v. Dayrit,* 301 *N.J.Super.* 334, 350–54, 693 *A.*2d 1287 (App.Div.), *certif. granted,* 151 *N.J.* 465, 700 *A.*2d 878 (1997).

We are mindful that even prior to *Largey,* and in a context which did not involve surgery but rather the ultimate in non-treatment, withholding life-sustaining procedures, the Supreme Court itself recognized that informed consent requires "the patient [or the incompetent patient's surrogate to] have a clear under-standing of the risks and benefits of the proposed treatment alternatives or nontreatment, along with a full understanding of the nature of the disease and the prognosis." *In re Conroy, supra,* 98 *N.J.* at 347, 486 *A.*2d 1209 (quoting Wanzer, Adelstein, Cranford, Federman, Hook, Moertel, Safar, Stone, Taussig & Van Eys, *The Physician's Responsibility Toward Hopelessly Ill Pa-tients,* 310 *New Eng. J. Med.* 955, 957 (1984)). To the extent that narrow references in *Model Jury Charges–Civil,* § 5.36C (1992) tend to suggest that the concept of informed consent does not extend beyond surgical procedures, that charge must be tailored for delivery to the jury so as to incorporate concepts which currently prevail.

Much evidence was presented by the parties at trial on both sides of the question whether the course of treatment undertaken by defendant comported with prevailing standards of care in the circumstances. If that were the only question in the case, we would be obliged to affirm the jury's verdict on the ultimate malpractice determination by reason of the substantial evidence rule. *See Carrino v. Novotny,* 78 *N.J.* 355, 360, 396 *A.*2d 561 (1979). The related and inseparable issue of informed consent was not developed through lay and expert testimony, however, because of the pervasiveness of the trial judge's limiting rulings and the strictness with which they were enforced. Plaintiff was precluded from introducing another, integral element of the ultimate issue apart from whether the course of treatment was properly adminis-tered: whether it should have been chosen at all, by defendant. The selection, logically stemming from a balance of factors bearing upon plaintiff's lifestyle and her ability to function with relative

independence, as well as from considerations relating to her physical condition in general and the medical prognosis, was plaintiff's to make. It was manifestly not "a pure medical judgment" committed to the physician's discretion. *See Largey v. Rothman, supra,* 110 *N.J.* at 212, 540 *A.*2d 504 (quoting Louisell and Williams). *See also, Morlino v. Medical Center of Ocean County,* 152 *N.J.* 563, 706 *A.*2d 721 (1998).

■ Even the record before us, as attenuated as it may be on the informed consent issue by reason of the trial judge's rulings, contains suggestions on both sides of the issue. There is some evidence, in defendant's own testimony for example, that he discussed with plaintiff the procedures which would be involved if a surgical course were to be selected, including the possible need for transfusions, about which plaintiff was apprehensive because of her medical history. Plaintiff contended, however, that defendant never delineated a surgical course as an option. In any event, because of the trial judge's erroneous rulings, the issue was never fully developed for the jury or committed to its evaluation. In a closely related vein, we cannot ignore the possible impact on the jury's deliberations concerning the basic medical malpractice question it did consider that defendant was permitted to testify to discussing the surgical option with plaintiff and her rejection of it, while plaintiff was severely limited throughout in developing evidence that informed consent was lacking.

■ Defendant's own testimony suggests that he made the decision to treat plaintiff conservatively after assessing her physical condition and determining that plaintiff would be better off in the care of others, *i.e.,* that she could not live alone. As we have held, this was not defendant's decision to make. To the extent the treatment choice ordained, or even only foreshadowed, the result defendant anticipated, he was required to disclose to plaintiff not only the medical and surgical risks attending each available course of treatment, but also the probable physical outcomes of each and their likely effects on plaintiff's lifestyle, so that she could make the choice after balancing all appropriate considerations of risk,

benefit, and outlook. In short, plaintiff, before making the choice, was entitled to have as complete a basis in information and projections as defendant was reasonably able to provide. Defendant could not validly substitute his own judgment for plaintiff's in electing the course of treatment she would undergo.

At minimum, plaintiff was entitled to know the reasons why defendant saw the non-surgical option as preferable, and the premises upon which those reasons were based. Defendant was also obliged, at the very least, to tell plaintiff what the apprehended risks were in the course of treatment he proposed to undertake, *i.e.*, as he testified at trial, that displacement was likely to occur resulting in a slight shortening of plaintiff's leg, and what that likelihood portended, medically as well as in respect of plaintiff's lifestyle.

Plaintiff had a right to a jury determination whether her individual autonomy had been adequately respected by defendant and, if not, whether, as a matter of reasonable likelihood, she suffered a significant detriment as a result. *Cf. Scafidi v. Seiler,* 119 *N.J.* 93, 108, 574 *A.*2d 398 (1990) ("Evidence demonstrating within a reasonable degree of medical probability that negligent treatment increased the risk of harm posed by a preexistent condition raises a jury question whether the increased risk was a substantial factor in producing the ultimate result.")

 In cases of this type, the jury's consideration should begin with a focused, two-step evaluation process. First, the jury must, with adequate basis in the evidence and sufficient guidance from the court, address the question whether two or more treatment alternatives were reasonably available in the circumstances as measured by prevailing medical standards. If it determines that such choices were available, the jury must then decide whether the patient was properly advised so as to be able either to make an informed choice from among the available alternatives, or to give an informed consent to the course of treatment selected by the physician.

 If the jury determines that the patient was inadequately advised, the next issue is proximate causation. *Largey,* itself, provides the necessary guidance in this regard.

As with other medical malpractice actions, informed-consent cases require that plaintiff prove not only that the physician failed to comply with the applicable standard for disclosure but also that such failure was the proximate cause of plaintiff's injuries. *See Cheung v. Cunningham,* 214 *N.J.Super.* 649, 520 *A.*2d 832 (App.Div.1987); *Nicholl v. Reagan,* 208 *N.J.Super.* 644, 506 *A.*2d 805 (App.Div. 1986); *Skripek v. Bergamo, supra,* 200 *N.J.Super.* at 636–38, 491 *A.*2d 1336.

Under the "prudent patient" standard "causation must also be shown: *i.e.,* that the prudent person in the patient's position would have decided differently if adequately informed." *Perna v. Pirozzi, supra,* 92 *N.J.* at 460 n. 2, 457 *A.*2d 431 (citing *Canterbury, supra,* 464 *F.*2d at 791; Louisell and Williams, *supra,* § 2208 at 22–32 to –35). As *Canterbury* observes,

"[t]he patient obviously has no complaint if he would have submitted to the therapy notwithstanding awareness that the risk was one of its perils. On the other hand, the very purpose of the disclosure rule is to protect the patient against consequences which, if known, he would have avoided by foregoing the treatment. The more difficult question is whether the factual issue on causality calls for an objective or a subjective determination." [464 *F.*2d at 790.]

*Canterbury* decided its own question in favor of an objective determination. The subjective approach, which the court rejected, inquires whether, if the patient had been informed of the risks that in fact materialized, he or she would have consented to the treatment. The shortcoming of this approach, according to *Canterbury,* is that it

"places the physician in jeopardy of the patient's hindsight and bitterness. It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk." [*Id.* at 790–91.]

The court therefore elected to adopt an objective test, as do we. Because we would not presume to attempt an improvement in its articulation of the reasons, we quote once again the *Canterbury* court:

"Better it is, we believe, to resolve the causality issue on an objective basis: in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance. If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not. The patient's testimony is relevant on that score of course but it would not threaten to dominate the findings. And since that testimony would probably be appraised congruently with the factfinder's belief in its reasonableness, the case for a wholly objective standard for passing on causation is strengthened. Such a standard would in any event ease the factfinding process and better assure the truth as its product." [*Id.* at 791.]

In this state the objective test was applied in *Skripek v. Bergamo, supra,* 200 *N.J.Super.* at 636–38, 491 *A.*2d 1336, and later in *Nicholl v. Reagan, supra,* 208 *N.J.Super.* at [651], [506 *A.*2d 805], which allowed *Skripek's* reasoning. When another panel of the Appellate Division adopted the subjective test in *Cheung v. Cunningham, supra,* 214 *N.J.Super.* at 655, 520 *A.*2d 832 it erred; hence its opinion may no longer be considered persuasive authority.

[*Largey v. Rothman, supra,* 110 *N.J.* at 215–16, 540 *A.*2d 504.]

In arguing the issue before the trial court, defendant objected to the idea of a broader application of informed consent on the ground that under it "every medical decision that's made would require the informed consent of the patient." We do not so hold, because the Supreme Court has clearly repudiated any such notion. *See, e.g., Largey v. Rothman, supra,* 110 *N.J.* at 212, 213–14, 540 *A.*2d 504. Conventional medical judgments during the course of treatment remain for the physician to make, subject to ordinary malpractice controls. But determinations bearing upon which course of treatment to adopt are the capable patient's prerogative, assisted by as much information and advice as the physician may reasonably be able to furnish. This is especially so not only where considerations of medical risk and benefit are involved in the choice of treatment, but also where lifestyle choices and other considerations of personal autonomy are implicated. To the extent the physician has a view as to which of the reasonably available alternative courses of treatment is the best in the circumstances as a matter of medical judgment, the physician must also give the patient the benefit of a recommendation. There is no reasonable basis for the apprehension, as expressed by defendant in argument before the trial judge, that the physician will ever be required to perform surgery or administer any other course of treatment that he or she believes to be contraindicated. If the patient selects a course, even from among reasonable alternatives, which the physician regards as inappropriate or disagreeable, the physician is free to refuse to participate and to withdraw from the case upon providing reasonable assurances that basic treatment and care will continue. In such circumstances, there can be no liability for the refusal.

For the purposes of this case, we hold only that the issue of informed consent was a proper one for introduction in the circumstances of the case, and that the trial judge erred in excluding it. Plaintiff was entitled to a jury determination whether the treatment choice effected by defendant was one that, in all reasonable probability, would not have been selected by plaintiff herself if more information had been provided; and resulted in harm or injury to the plaintiff that would not otherwise have occurred. When precluded from developing this line of inquiry, plaintiff was not afforded a fair opportunity to prove her allegations of medical malpractice. Because the basic negligence issue is so inescapably intertwined with the informed consent issue, a new trial on both is required.

Reversed and remanded.