727 A.2d 518 (1999)
320 N.J. Super. 453
Marge TEILHABER, Plaintiff-Appellant,
v.
Robert GREENE, M.D., Defendant-Respondent, and
K. Walters, Inc., Kenneth Walker, Jr., Mountainside Hospital, Peter Wujciak, M.D., Michael Wujciak, M.D., Richard Mattern, M.D., Stephen Richman, M.D., Barry Loigman, M.D., Ronald Reese, M.D., Kessler Institute for Rehabilitation, Steven Kirschblum, M.D., D.V. Patel, M.D., Z.S. Herc, M.D., and Stephen Locurio, M.D., Defendants.
Superior Court of New Jersey, Appellate Division.
Submitted October 14, 1998.
Decided April 23, 1999.
*520 Eugene M. Banta, Walwick, for plaintiff-appellant.
Giblin & Combs, Morristown, for defendant-respondent (Christopher W. Hyde, on the brief).
Before Judges PRESSLER, KLEINER, and STEINBERG.
*519 The opinion of the court was delivered by KLEINER, J.A.D.
This is a medical negligence case. Plaintiff's complaint, filed February 24, 1994, and thereafter amended solely to add additional defendants, was dismissed on the motion of defendant Dr. Robert Greene at the close of plaintiff's case. Because we conclude that plaintiff's direct evidence at trial presented a prima facie claim of medical negligence, we reverse and remand for a new trial.
I
We commence our analysis by a review of the testimony offered by plaintiff, Marge Teilhaber, in her direct case.
On February 24, 1992, plaintiff suffered severe fractures of both legs in an automobile collision. Plaintiff was transported to Mountainside Hospital, where she was examined in the emergency room by two physicians, Drs. Peter Wujciak and Michael Wujciak. Pending further patient consultation, plaintiff was stabilized by the insertion of a pin in each leg.
The following day, both physicians returned to further examine plaintiff and to discuss with her a proposed course of treatment. According to plaintiff, both physicians proposed surgery on each leg and neither physician discussed any alternative form of treatment. Yet, plaintiff offered into evidence the hospital records which included Drs. Wujciaks' service notes reflecting: "extensive discussion ... with patient and family... outlining treatment alternatives including traction management through rigid internal fixation," and "[E]xtensive discussions were had with the patient and family and in particular the mother as to possible surgical and nonsurgical alternatives to management that were available."
Plaintiff, desiring a second opinion, consulted defendant Dr. Robert Greene, an orthopedic surgeon. According to defendant's deposition testimony,[1] he spoke with the Drs. Wujciak before he met plaintiff. After examining plaintiff, defendant advised her that he would treat her with traction. Plaintiff testified that defendant advised her of the problems associated with traction: discomfort and aggravation from lying on her back for several months, pulmonary embolism, and bed sores. She indicated that she elected to be treated by defendant because she "liked hearing" that defendant could "take care of [her] without surgery," and because of her trust in him attributable to his "confident demeanor." We find a portion of plaintiff's testimony and the comments of the trial judge pertinent to our ultimate conclusion in this appeal.
Q. And what was it that Dr. Greene told you when he came in to see you in reference to a second opinion?
A. He said very clearly and very confidently that he could getwe could get the same good result from traction.
Q. The same good results from traction as what?
A. As opposed to surgery, because he had spoken to the Dr. Wujciaks and he knew what they had in mind and he examined the x-rays. And I'm very clear that he said, very confidently, I can get you the same good results with traction.
Q. And your mother and father were
The Court: This is not a contract guarantee state. I'm serious. I mean, it should not be. Those kinds of things have nothing whatever to do with whether or not he deviated from any accepted standards. *521 This is not an informed consent case and it's not a contract case.
Plaintiff's counsel: I understand that. May I proceed?
...
Q. Did Dr. Greene ever speak to you about the possibility of having the open reduction surgery done?
A. No. Didn't even mention it.
Q. Did he ever
A. Other than saying that he felt that the goodthe resultthe result would be similarly good results.
Q. He did not make any recommendation that you have open reduction surgery?
A. Absolutely not.
Defendant's consultant's report, included in the hospital record which was offered in evidence, reflects the following:
Definitive orthopedic treatment is primarily whether to leave this lady in skeletal traction until this fracture heals down into what would be quite satisfactory position or whether to do open reduction on these and consider doing intramedullary rods.... I wonder ... whether a blade would have enough fixation in the lateral condylar area to hold anything....
Plaintiff was placed in traction and remained at Mountainside Hospital until April 1992, when she was discharged to the Kessler Institute for Rehabilitation. In July 1993, plaintiff was discharged to her home under the care of a twenty-four-hour attendant. On that day, plaintiff was walking with the aid of a walker. Three days later plaintiff was x-rayed. Defendant read those x-rays and informed plaintiff that the bones in her legs were not aligned, that she would "never have a normal walk" and that she would "need an osteotomy[2] of both legs in order to walk normally."
Plaintiff then consulted Dr. Howard Rosen. Dr. Rosen performed an osteotomy on plaintiff's left leg on September 21, 1992. After conservative treatment on plaintiff's right leg failed to correct the non-alignment, Dr. Rosen performed an osteotomy on plaintiff's right leg in June 1995.
Plaintiff filed a complaint on February 24, 1994, and an amended complaint on June 15, 1994. In the amended complaint, plaintiff asserted, in part:
Defendants[3] were negligent and careless individually and in association in their care and treatment ... and failed to render the medical care that plaintiff's condition demanded and either lacked the skill and ability to render the care and treatment that the plaintiff's condition demanded or failed to use the skill and ability which they did possess in treating the plaintiff and the defendants were further negligent and careless in failing to, during their care and treatment of the plaintiff, properly perform surgical procedures upon the plaintiff and to perform the necessary tests and examinations of the plaintiff in the area upon which a surgical procedure was performed on or about February 25, 1992 and for some time thereafter failed to properly observe and to apply the results of such observation to the plaintiff's physical condition in the area of the proposed surgical procedure which was rendered on or about February 25, 1992....
At trial, in addition to plaintiff's testimony and the corroborative testimony offered by her mother, plaintiff's only witness was her expert, Dr. Elias Sedlin, a board-certified orthopedic surgeon associated with the Mt. Sinai Medical Center in New York. Because the trial judge dismissed plaintiff's amended complaint at the close of plaintiff's case, we must fully evaluate Dr. Sedlin's testimony.
Dr. Sedlin opined that the use of traction was abandoned twenty-five or thirty years *522 ago by the "fraternity," or the "orthopedic group," and that traction "has no place in the treatment of this injury, save with certain kinds of patients who are never going to walk again, never did walk ... [o]r where they have certain life-threatening problems precluding a definitive operation." Dr. Sedlin testified that the use of traction as the treatment for plaintiff's injury was "grossly inappropriate." "The decision to maintain the patient in traction was a deviation from accepted medical standards" and plaintiff's poor result flowed from the fact that plaintiff had traction rather than surgery. He opined that traction was unacceptable because "it can't do the job." Additionally, (1) the medical complications associated with traction, which he enumerated, outweigh the medical complications of surgery; and (2) traction prohibits the knee from moving, and the ultimate goal of the treatment for a fractured leg, aside from aligning the bone, is for the knee to move well. He explained that the development of surgical plates and the greater understanding of the benefits of joint mobilization made surgery the preferred treatment for severe leg injuries.
Dr. Sedlin did admit that surgery also creates some problems, as one in four patients who would undergo this type of surgery, initially recommended by the Drs. Wujciak, would "have some failure," but that the alternatives to surgery "were worse."[4]
After plaintiff rested her case, defendant moved for a directed verdict. During the colloquy that followed, the trial judge stated: "This is not an informed consent case. The patient makes the decision, not the doctor.... The testimony is clearly that the patient was given two choices, surgery or traction.... [O]nce the patient has been given the option, it is not up to the physician. The physician can not overrule the patient."
The judge asked plaintiff's counsel, "Well, tell me what the [cause] of action is then," to which plaintiff's counsel began to respond, "Defendant deviated from accepted medical practice by suggesting to [plaintiff] and giving a specific statement that we...."
The trial judge interrupted and stated, "You never brought this as an informed consent case. If you were saying she was given bad information, that's an informed consent case." In further colloquy the judge emphasized that plaintiff had been informed about surgery by Drs. Wujciak and then indicated, "I don't think there's anything wrong whatsoever in trying the less invasive situation first." After further colloquy, the judge again indicated, "This is the way I'm reading this. It's being argued as an informed consent case." He also added:
The question is ... is it a battery to treat the patient without the patient's consent. You, therefore, have to have informed consent. But it is the patient, not the doctor. We don't even use professional standard anymore. Wewhether we used to use before Largey [v. Rothman, 110 N.J. 204, 540 A.2d 504 (1988)], we used to call it a professional standard, which I didn't quite agree with anyway, but I can't imagine that any doctor would come in and say you have the right to make the decision. That's exactly what Sedlin was doing. Sedlin was going on the professional standard *523 more than ... the patient's standard.... And this patient was informed. The patient may haveand I'm not disagreeing with her or anything else like that. She had the option. It is not an informed consent case. You are telling me there's a deviation. She opted for that treatment.
The judge later stated, "You brought a deviation case. You said it was a deviation not underto put her under the knife. And I'm telling you, that's her choice." The judge acknowledged that the patient has the right to choose the procedure of treatment for an injury, and the doctor must provide information that a reasonably prudent patient needs to make an informed decision. "There is no question she had the information. She made the decision"; and though Dr. Greene did not give the patient the option of surgery, she already knew of the surgical option from the Wujciaks, and "[t]he law says that you don't have to tell people what they already know." The judge then concluded that plaintiff had failed to present a prima facie case, and that "if there had been any case whatsoever, it would have been an informed consent case ... [a]nd that's not the way the case was presented and there is no evidence to support an informed consent case in this ... instance."
In plaintiff's sole point of error asserted in her appeal she contends: "The Court below erred in directing a verdict of dismissal of plaintiff's case when she rested following completion of its presentation." We agree and reverse.
We commence our analysis recognizing that the issue is whether the evidence, together with the legitimate inferences that can be drawn from it, sustain the judgment in favor of defendant rendered at the close of plaintiff's case. R. 4:37-2(b). We must accept as true all evidence supporting plaintiff's claim and accord her the benefit of all favorable inferences; if reasonable minds could differ, the motion to dismiss must be denied. Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969).
Here, the trial judge concluded that plaintiff's theory was predicated upon a cause of action grounded solely in "informed consent" and that plaintiff had failed to allege that theory in her complaint. To the contrary, we conclude that the judge too narrowly viewed the gravamen of plaintiff's amended complaint and then too narrowly viewed the evidence presented.
A plaintiff may bring an action against a doctor for personal injuries under at least three theories: deviation from the standard of care, see Gardner v. Pawliw, 150 N.J. 359, 696 A.2d 599 (1997); lack of informed consent, see Largey v. Rothman, 110 N.J. 204, 540 A.2d 504 (1988); and battery, see Perna v. Pirozzi, 92 N.J. 446, 457 A.2d 431 (1983).[5] However, it is now clear that both deviation from the standard of care and failure to obtain informed consent are simply sub-groups of a broad claim of medical negligence. Baird v. American Medical Optics, 155 N.J. 54, 70, 713 A.2d 1019 (1998) (citing Perna, supra, 92 N.J. at 459, 457 A.2d 431; Lugenbuhl v. Dowling, 701 So.2d 447, 452 (La.1997)). The Baird Court disapproved a premise enunciated in Lombardo v. Borsky, 298 N.J.Super. 658, 690 A.2d 150 (App.Div.), certif. granted, 150 N.J. 28, 695 A.2d 671 (1997), and appeal dismissed, 153 N.J. 44, 707 A.2d 149 (1998), "that a medical malpractice claim differs so fundamentally from one based on the failure to obtain a patient's informed consent that the statute of limitations on the consent claim should start running on a date different from that applicable to the medical malpractice claim" and thus the Baird Court overruled Lombardo. 155 N.J. at 70, 713 A.2d 1019.
*524 A complaint must set forth a claim for relief that contains "a statement of the facts on which the claim is based, showing that the pleader is entitled to relief, and a demand for judgment for the relief to which the pleader claims entitlement." R. 4:5-2. In Spring Motors Distribs., Inc. v. Ford Motor Co., 191 N.J.Super. 22, 465 A.2d 530 (App.Div.1983), aff'd in part and rev'd in part on other grounds, 98 N.J. 555, 489 A.2d 660 (1985), we noted the requirement that a pleading must "fairly apprise the adverse party of the claims and issues to be raised at trial" and further held that "[o]n an attack upon a complaint all facts, reasonable inferences and implications are to be considered most strongly in favor of the pleader." 191 N.J.Super. at 29-30, 465 A.2d 530 (citations omitted). "A complaint ... is not required to spell out the legal theory upon which it is based." Farese v. McGarry, 237 N.J.Super. 385, 390, 568 A.2d 89 (App.Div.1989). Because pleadings are primarily fact-based, the court may instruct the jury as to a legal theory not expressly alleged if all of the underlying facts have been pleaded and proved. Id. at 390-92, 568 A.2d 89; Pressler, Current N.J. Court Rules, comment on R. 4:5-2 (1999).
These general concepts are particularly important in construing a complaint alleging medical negligence. As the Court noted in Baird:
In most cases, medical malpractice and informed consent claims will conform so closely that knowledge of facts sufficient to start the statute of limitations on one claim should start running on the other. The statute should start running on both claims when injured parties know of their injuries and of facts sufficient to support the institution of either claim.
[155 N.J. at 71, 713 A.2d 1019.]
Here, plaintiff's amended complaint alleged in part, "[Defendant] failed to properly observe and to apply the results of such observation to the plaintiff's physical condition in the area of the proposed surgical procedure." (emphasis supplied). Viewed liberally, and giving all "reasonable inferences and implications ... in favor of the pleader," Spring Motors, supra, 191 N.J.Super. at 29-30, 465 A.2d 530, we can infer that plaintiff's complaint encompassed a claim that defendant, after observing plaintiff's condition, failed to apply the results of his observation to provide plaintiff with sufficient information so as to inform her of the alternative types of treatment available to treat her leg injuries.
To establish a prima facie case for medical negligence premised on a theory of liability for lack of informed consent, a plaintiff must show "(1) the physician failed to comply with the applicable standard for disclosure; (2) the undisclosed risk occurred and harmed the plaintiff; (3) a reasonable person under the circumstances would not have consented and submitted to the operation or surgical procedure had he or she been so informed; and (4) the operation or surgical procedure was a proximate cause of plaintiff's injuries." Bennett v. Surgidev Corp., 311 N.J.Super. 567, 572-73, 710 A.2d 1023 (App.Div.1998) (citing Largey, supra, 110 N.J. at 215, 540 A.2d 504; Caputa v. Antiles, 296 N.J.Super. 123, 133-34, 686 A.2d 356 (App.Div.1996), certif denied, 149 N.J. 143, 693 A.2d 112 (1997)); see also Matthies v. Mastromonaco, 310 N.J.Super. 572, 589, 709 A.2d 238 (App.Div.), certif. granted, 156 N.J. 406, 719 A.2d 638 (1998) (citing Largey, supra, 110 N.J. at 206, 540 A.2d 504). It seems abundantly clear that plaintiff's expert provided a sufficient opinion, coupled with plaintiff's testimony, that defendant did not discuss with her an alternative form of treatment, i.e., surgery. As such, we conclude that plaintiff brought forth evidence supporting the claim that defendant failed to comply with the applicable standard for disclosure and supporting a prima facie case for negligence based on lack of informed consent. Bennett, supra, 311 N.J.Super. at 572, 710 A.2d 1023.
To establish a prima facie case of negligence in a medical malpractice action alleging deviation from the standard of care, "a plaintiff must present expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury." Gardner, supra, 150 N.J. at 375, 696 A.2d 599 (citations omitted).
*525 Thus, we can additionally conclude that defendant deviated from the applicable standard of care in providing information to his patient. Because plaintiff brought sufficient evidence to support a prima facie case for medical negligence based on both theories of liabilitylack of informed consent and deviation from the standard of carethe trial judge should have refrained from granting defendant's motion to dismiss at the close of plaintiff's case.
Even if the judge viewed plaintiff's complaint as deficient, a "deficient" complaint that omits a specific legal theory may be remedied at trial by showing the appropriate proofs for the omitted theory. Farese, supra, 237 N.J.Super. at 390-92, 568 A.2d 89. Rather than grant defendant's motion for an involuntary dismissal at the close of plaintiff's case, R. 4:37-2(b), the judge should have permitted plaintiff to amend her complaint to more specifically allege a theory of medical negligence encompassing a theory of liability based on lack of informed consent. We reach this conclusion despite the fact that at one point in the initial colloquy, plaintiff's counsel agreed with the judge's observation that plaintiff's cause of action was not one of informed consent. We fully recognize that counsel's agreement with the judge's observation occurred as an aside during plaintiff's testimony, well before counsel had fully presented the entirety of plaintiff's claim and prior to presenting plaintiff's expert's opinion.
In sum, plaintiff's complaint, when liberally construed, did assert a medical negligence claim premised upon a theory of liability for lack of informed consent and plaintiff's entire case at the close of the testimony, when liberally construed, was sufficient to withstand defendant's motion to dismiss pursuant to R. 4:37-2(b). Dolson v. Anastasia, supra, 55 N.J. at 5, 258 A.2d 706.
Reversed.
NOTES
[1] Portions of defendant's deposition testimony were read to the jury by plaintiff's counsel on plaintiff's direct case.
[2] As explained at trial, osteotomy is a surgical procedure whereby the bone is broken and reset with a plate attached to the bone. The purpose of osteotomy is to adjust the weight on the joint.
[3] Before the commencement of trial, all defendants except Dr. Greene, Kessler Institute for Rehabilitation, and Dr. Steven Kirschblum were dismissed. At trial, after counsel for Dr. Greene concluded his opening statement, the trial judge dismissed plaintiff's amended complaint as to defendants Kessler Institute for Rehabilitation and Dr. Kirschblum. Plaintiff's appeal does not assert that the dismissal as to those defendants was in error.
[4] On cross-examination of Dr. Sedlin, the following was elicited:

Q. Well, if this patient had been given surgery that you have testified would have been appropriate, is there a percentage of likelihood that that surgery would not have been successful?
A. About one in four.
Q. Yeah, 25 percent.
A. 75 percent will get good and excellent results.
Q. One out of four would have some failure.
A. Failure or poor results. Whatever you want tohowever you define those terms.
Q. Would you offer any alternative to the patient?
A. What do you mean?
Q. Well, if a patient is given a one in four chance of having something bad, poor outcome, come out of it it
A. I said fair or poor.
Q. Have you ever offered those odds to a patient?
A. If they ask me, yes. But the alternatives are worse.
Q. The alternatives being surgical or skeletal traction?
A. Or putting the patient in atrying closed manipulation and putting the patient in a cylinder cast.
Q. Putting the patient in a body cast?
A. Cylinder. In a long-leg cast, from the hip to the ankleto the foot, the toes, rather.
[5] "`Most authorities ... prefer to treat informed consent liability solely as an aspect of malpractice or negligence, rather than battery.... [T]he problem of informed consent is essentially one of professional responsibility, not intentional wrongdoing, and can be handled more coherently within the framework of negligence law than as an aspect of battery.'" Baird v. American Medical Optics, 155 N.J. 54, 70-71, 713 A.2d 1019 (1998) (quoting 1 Fowler V. Harper et al., The Law of Torts, § 310 n. 20 (2ed.1988)). See also Largey, supra, 110 N.J. at 207-08, 540 A.2d 504 (tracing the historical roots of the modern theory of informed consent and indicating that the theory flowed from the tort of battery, but is now firmly rooted in the concept of negligence).