871 A.2d 733

WALTER STAROZYTNYK AND NANETTE STAROZYTNYK, HIS WIFE, PER QUOD, PLAINTIFFS–APPELLANTS, v. DR. STEVEN M. REICH, DEFENDANT–RESPONDENT, AND DR. J. GERARD CROWLEY, DR. TODD STEFAN, DR. ALAN M. GRAHAM, ROBERT WOOD JOHNSON UNIVERSITY HOSPITAL, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued March 16, 2005—Decided April 25, 2005.

Before Judges NEWMAN, AXELRAD and HOLSTON, JR.

*Douglas S. Grossbart* argued the cause for appellant (*Prince & Portnoi* and *Douglas Grossbart*, attorneys; *Andrew S. Prince*, of counsel; *Mr. Grossbart*, on the brief).

*Jill R. O'Keeffe* argued the cause for respondent (*Orlovsky, Moody, Schaaff & Gabrysiak*, attorneys; *Paul F. Schaaff, Jr.*, on the brief).

The opinion of the court was delivered by

AXELRAD, J.T.C. (temporarily assigned).

The issue in this appeal is whether under our Supreme Court's decisions in *Perna v. Pirozzi*, 92 *N.J.* 446, 457 *A.*2d 431 (1983), and *Howard v. University of Medicine and Dentistry of New Jersey*, 172 *N.J.* 537, 800 *A.*2d 73 (2002), a patient who consents to a spinal fusion by one surgeon under the mistaken belief that he is being assisted by a specific vascular surgeon, and has no proof of injuries resulting from the substitution, has an action against the operating surgeon for battery, breach of contract, or breach of fiduciary duty owed by a physician to a patient. The trial judge found in the negative and granted summary judgment in favor of the defendant-surgeon who obtained the consent and performed the operation. We affirm.

I

In this medical malpractice action, plaintiff Walter Starozytnyk [1] appeals from summary judgment in favor of defendant Dr. Steven Reich, who performed his spinal fusion surgery, dismissing his claims for battery, lack of informed consent, breach of contract and breach of fiduciary duty. Plaintiff's claim was based on the allegation that defendant had told him a specific vascular surgeon, Dr. Alan Graham, would perform the vascular portion of plaintiff's

---

[1] "Plaintiff" refers to Walter Starozytnyk and "plaintiffs" includes his wife, Nanette Starozytnyk, who asserted a *per quod* claim.

surgery and the specified doctor was not the surgeon who assisted in the operation.

Plaintiff had been a patient of Dr. Reich since 1993 for lower back pain. Dr. Reich performed back surgery on him in 1994 but by mid–1997, plaintiff had increasing pain in his lower back. At his deposition, plaintiff testified he was very reluctant to undergo the surgery recommended by Dr. Reich, an anterior spinal fusion at two levels, L4–L5 and L5–S1, and the implementation of medical devices known as BAK cages. The principal factor influencing plaintiff to change his mind and have the surgery was that "Dr. Reich told [him] that [Dr. Reich] would be able to get the chief vascular surgeon at Robert Wood Johnson Hospital [Dr. Graham] to perform the vascular surgery part of the surgery." Dr. Reich also told him Dr. Graham was "the one who taught the other doctors how to do it. That he was one of the best surgeons in the country. And that you couldn't get anybody better. That he was the teacher who taught the teachers." Plaintiff agreed to undergo the surgery when, after six months of discussing the surgery and his reticence at great length, Dr. Reich promised he would get Dr. Graham to perform the vascular part of the surgery. Plaintiff testified he wanted Dr. Graham to be present to ensure that he would not suffer from a condition known as retrograde ejaculation, a potential side effect of the procedure.

Plaintiff went to the hospital on October 21, 1997 for pre-operative testing, where he received a phone call from Dr. Reich's office stating that the surgery was to be rescheduled because of Dr. Graham's unavailability. Prior to the surgery, plaintiff did not speak to any physician involved in the surgery other than Dr. Reich. Plaintiff claimed he would not have gone through with the surgery if he had known Dr. Graham would not be present; this point was clearly communicated to and understood by Dr. Reich. Christine Rudolph, RN, a case manager from plaintiff's workers' compensation insurance carrier who accompanied him on his visits to Dr. Reich, wrote in an October 2, 1997 report that "Dr. Graham

who is Director of Vascular Surgery [would] be present" at the surgery tentatively scheduled for October 21, 1997.[2]

On November 4, 1997, plaintiff was admitted for surgery to Robert Wood Johnson University Hospital. He signed a "Request for Operative or Procedural Intervention," a boilerplate form which authorized Dr. Reich "and whomever [Dr. Reich] may designate as his assistant(s) to perform the operation or procedure" identified on the form as anterior spinal fusion. Dr. Reich performed the surgery with the assistance of Dr. Todd Stefan and Dr. J. Gerard Crowley. Dr. Graham was not present.

Two or three days post-surgery, plaintiff felt tremendous pain in his right leg which radiated into his foot, and his right big toe was extremely swollen. His stomach was also distended. X-rays indicated an intestinal blockage. Plaintiff asked to speak with Dr. Graham, thinking the vascular surgeon would be able to explain the blockage. He was then informed that Dr. Graham had not performed the surgery.

During his last visit with Dr. Reich, accompanied by Ms. Rudolph, plaintiff questioned him about the identity of the surgeon who performed the vascular part of his operation. Dr. Reich responded that it was Dr. Graham. Plaintiff recounted the discussion in his deposition testimony:

> I asked Dr. Reich who was the vascular surgeon that operated on me. And oh, he told me it was Dr. Graham. And I said to him, "I know it wasn't Dr. Graham. I don't know who it was, but I know it wasn't Dr. Graham." So then Dr. Reich started looking through his notes, going through paper after paper and he was becoming very agitated.

> And he couldn't find the name of the doctor, he slammed the book shut and started shouting, "I know where"—he said something to the effect "I am not going to answer this. I was there every minute of the time. It's not like I went out and had coffee and came back. I am not going down this road with you." He slammed his book shut, and said, "I will see you in three weeks," and stormed out of the

---

[2] At the case management conference on November 17, 2003, plaintiff was given time to attempt to locate Ms. Rudolph. It is unknown whether he was successful.

door. And then I looked at Christine and we just couldn't believe what happened. And we got up and left.

On November 16, 2001, Dr. Graham and Dr. Crowley both testified at depositions that they had no knowledge of the alleged agreement between Dr. Reich and plaintiff regarding the assistance of only Dr. Graham at the surgery. Dr. Graham testified that the doctor who assists in surgery is based upon "whoever is available that day or if the patient is directed specifically through the offices," the latter part meaning if "[t]he patient comes in my office to see me specifically, then, obviously he's my patient, but generally cases are booked from this [Dr. Reich's] office to my office." Dr. Crowley testified that Dr. Reich's secretary would notify him when he was needed to assist. There were never occasions in which he was specifically requested by other physicians to assist in spinal surgeries.

At depositions, Dr. Reich testified he never told plaintiff that Dr. Graham would be the vascular surgeon who would assist in his surgery. He further testified he never had a patient ask for a particular assisting surgeon to be put on the consent form and he would not satisfy such a request. For purposes of his summary judgment motion, however, Dr. Reich accepted plaintiff's factual assertions that he had promised to use Dr. Graham as the vascular surgeon in plaintiff's back surgery but instead used Dr. Crowley. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995); *R.* 4:46.

Plaintiff suffered significant residual effects from the operation. Plaintiff presented a February 10, 2004 expert report of Dr. Allan D. Tiedrich, a physician specializing in physical medicine and rehabilitation, opining that the surgery had caused retrograde ejaculation and a painful neurological condition known as reflex sympathetic dystrophy (RSD), and that the increased chronic back pain was an exacerbation of plaintiff's previous pain. According to Dr. Tiedrich, these injuries were permanent and plaintiff's prognosis was poor. The expert did not opine that these conditions resulted from physician negligence; they appear to have been a known risk or a possible result of the surgery.

Plaintiff also presented the office notes of his treating psychiatrist,[3] Dr. Jose Vasquez, that on December 12, 1997, plaintiff was "depressed and anxious about his current medical condition," "cripple and sterile," "upset about outcome of surgery" "unable to walk" and "unable to sleep." His January 16, 1998 notation stated that plaintiff "remained depressed and angry about his current physical condition."

On November 3, 1999, plaintiff filed suit against Dr. Reich, Dr. Crowley, Dr. Stefan, Dr. Graham and Robert Wood Johnson University Hospital, alleging negligence and deviation from the standard of medical care, lack of informed consent, battery and breach of contract, and seeking compensatory and punitive damages. Plaintiff's wife asserted a *per quod* claim. Plaintiff thereafter dismissed by stipulation his claim against the hospital and all doctors other than Reich. Plaintiff abandoned his general malpractice claim asserting that the surgery was performed negligently in response to defendant's prior motion to dismiss for failure to provide an expert report as to deviation from the standard of care.

Defendant then moved for summary judgment on the remaining counts based on plaintiff's failure to provide an expert report on deviation and proximate cause. The court found there was no cause of action for battery based on plaintiff's consent to Dr. Reich operating on him. The court further found under a breach of contract, a breach of fiduciary duty and lack of informed consent theory that, accepting plaintiff's factual assertion that Dr. Reich had agreed to use Dr. Graham as a vascular surgeon but did not, his claims were still deficient due to a failure to establish a connection between the breach and damages. More specifically, the court stated:

---

[3] According to a notation in Ms. Rudolph's October 2, 1997 report, plaintiff had been under Dr. Vasquez's care since July 1995 for treatment of depression and anxiety relating to an accident he suffered at work on July 1, 1993.

Since ... Dr. Reich had the plaintiff's consent to operate on him, there is no cause of action for battery and, therefore, [summary judgment on that claim] is granted.

....

[E]ven though there is an issue of credibility perhaps between Dr. Reich and the plaintiff in this matter, the more central issue is any proximate cause to any damages that the plaintiff might have suffered. And there is not any evidence whatsoever that there is any such damage. And there is certainly not any discussion anywhere in this discovery of this case in terms of emotional distress that would even give rise to a punitive damage in reference to this matter. And therefore, the matter is dismissed as to the breach of contract, breach of fiduciary duty and lack of informed consent....

So the entire matter ... against Dr. Reich is in fact dismissed....

## II

Plaintiff raises the following issues on appeal:

*POINT I*

THE TRIAL COURT ERRED IN DISMISSING THE WITHIN MATTER AS OUR CASE LAW SUPPORTS A CLAIM BASED UPON BREACH OF CONTRACT AND BREACH OF A FIDUCIARY DUTY OF A DOCTOR TO HIS PATIENT.

A. Moreover, *Perna* applies a specific theory for liability with regard to Dr. Reich which includes that based on the deceit, defendant would be responsible for all injuries sustained whether the result of malpractice or not.

B. Pursuant to prior Court Order, Plaintiff has provided an expert report addressing proximate cause, damages and permanency.

*POINT II*

THE TRIAL COURT ERRED IN CONCLUDING THAT THERE WAS NOT EMOTIONAL DISTRESS AS A RESULT OF THIS SURGICAL PROCEDURE.

*POINT III*

THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AS GENUINE ISSUES OF MATERIAL FACT EXIST AND AS PLAINTIFF SHOULD HAVE THE RIGHT TO COME BEFORE A JURY OF HIS PEERS REGARDING THE SURGICAL MISREPRESENTATION.

We affirm the court's ruling dismissing plaintiff's claim for battery as failing to set forth a cause of action against Dr. Reich, who performed the operation as authorized in the consent form. We also affirm the dismissal of plaintiff's breach of contract, lack of informed consent and breach of fiduciary duty claims because no proximately caused injury was alleged.

On appeal, as before the motion judge, plaintiff relies on *Perna* to support the causes of action asserted in his complaint against Dr. Reich and his claim that he is entitled to all damages proximately caused by the mere performance of the operation to which he did not consent, whether or not the result of physician negligence. Plaintiff argues that "Dr. Reich committed fraud by basically lying to him." He further contends that by "contracting or agreeing with Plaintiff to use a specific surgeon [Dr. Graham], who was not in fact used, defendant permitted others to commit a battery upon Plaintiff," as a result of which a jury could award him damages for mental anguish or punitive damages even in the absence of injuries proximately caused by the operating surgeon's negligence.

Plaintiff relies on Dr. Vasquez's notes as evidence of his emotional distress resulting from the belated knowledge that Dr. Graham had not assisted in the surgery. Moreover, according to plaintiff, a breach of contract claim is also appropriate because he specifically was told that a certain physician would be performing the vascular part of his operation and he relied on this representation in consenting to the procedure. Plaintiff additionally asserts that Dr. Tiedrich's report "connects the surgery to injury to plaintiff" and thereby addresses proximate cause, damages and permanency so as to withstand summary judgment.

Defendant counters that *Perna* does not support a battery claim against him where there was no non-consensual touching; he had plaintiff's consent to perform the operation and did so. Relying on *Howard*, he further contends that the remaining claims available to patients in actions against their physicians—deviation from the standard of care and lack of informed consent—both require plaintiff to establish proximate cause. *Howard, supra,* 172 *N.J.* at 548–49, 800 *A.*2d 73. Defendant urges that plaintiff cannot establish that the injuries he sustained were related in any way to Dr. Crowley performing the vascular part of his surgery as opposed to Dr. Graham. Defendant further argues that Dr. Tiedrich's report did not relate any injuries sustained by plaintiff to Dr. Crowley

performing the procedure instead of Dr. Graham.[4] We find
defendant's arguments persuasive.

In *Perna*, an operation was performed by a physician other than
the one named in the consent form (so-called "ghost surgery").
*Perna, supra*, 92 *N.J.* at 446, 457 *A.*2d 431. Thomas Perna
consulted Dr. Michael Pirozzi, a specialist in urology who had
previously treated him, who recommended he undergo surgery for
the removal of kidney stones. *Id.* at 451, 457 *A.*2d 431. Dr.
Pirozzi was part of a medical group which included Dr. Del Gaizo
and Dr. Ciccone. The doctors testified at trial that their medical
group customarily shared patients and operated as a "team," that
it was not their practice to inform patients which member would
operate, and that their regular practice was to decide just prior to
the operation who was to operate. *Ibid.* If a patient, however,
requested a specific member of the group as his surgeon, that
surgeon would perform the operation. *Ibid.* The plaintiff, who
was unaware of the group's custom of sharing patients or methods
for assigning surgical duties, signed a consent form that named
Dr. Pirozzi as the operating surgeon and authorized him, with the
aid of unnamed "assistants," to perform the surgery. The opera-
tion was performed by Dr. Del Gaizo and assisted by Dr. Ciccone,
both of whom were unaware that only Dr. Pirozzi's name appeared
on the consent form. *Id.* at 452, 457 *A.*2d 431. The plaintiff
became aware of the substitution of physicians when he developed
post-surgical complications. *Ibid.*

The plaintiff in *Perna* filed suit for malpractice against all three
doctors, alleging deviations from standard medical procedure. He
also asserted a lack of informed consent, contending his consent
had been conditioned on his belief that Dr. Pirozzi, whom he had
specifically requested, would perform the operation. *Ibid.* The
Court agreed that the other two surgeons who operated on the

---

[4] Dr. Tiedrich's report was submitted after the December 1, 2003 deadline
provided in the trial court's case management order but was considered by the
motion judge.

plaintiff, the "ghost surgeons," did not have his informed consent to perform the operation. *Id.* at 450, 457 *A.*2d 431. Denominating the matter a battery, the Court held that the plaintiff was entitled to recover against the ghost surgeons for all injuries proximately caused by the mere performance of the operation, whether the result of negligence or not. *Id.* at 460–461, 457 *A.*2d 431; *see also Howard, supra,* 172 *N.J.* at 551, 800 *A.*2d 73. The Court held "under a battery theory, proof of an unauthorized invasion of the plaintiff's person, even if harmless" entitles him at least to nominal damages and, in an appropriate case, may entitle him to damages for mental anguish resulting from the belated knowledge the operation was performed by a doctor to whom he had not given consent and to punitive damages, even if the patient suffers no injuries except those which may foreseeably follow from the operation. *Perna, supra,* 92 *N.J.* at 460–461, 457 *A.*2d 431; *see also Howard, supra,* 172 *N.J.* at 551–52, 800 *A.*2d 73.

The Court found that a different theory applied to the claim against Dr. Pirozzi, the non-operating surgeon, based on the alleged breach of his agreement and the fiduciary duty he owed his patient to perform the medical procedure himself after soliciting the patient's consent. *Perna, supra,* 92 *N.J.* at 463–465, 457 *A.*2d 431. According to the Court, "an alternative cause of action could be framed as a breach of contract between the surgeon and the patient, [but] generally the more appropriate characterization of the cause will be for breach of the duty of care owed by the doctor to the patient[ ] [although t]he absence of damages may render any action deficient. . . ." *Id.* at 465, 457 *A.*2d 431. The plaintiff in *Perna* did not allege a breach of contract. *Ibid.*

In *Howard,* the Court held that a fraud claim based on a neurosurgeon's alleged misrepresentation of his experience and credentials was unavailable to a patient who was rendered a quadriplegic from unsuccessful back surgery performed by that physician; however, the plaintiff could avail himself of a claim for lack of informed consent. *Howard, supra,* 172 *N.J.* at 537, 800 *A.*2d 73. The Court recognized that a patient currently has three

avenues of relief against a doctor; namely, (1) deviation from the standard of care (medical malpractice); (2) lack of informed consent; and (3) battery. *Id.* at 545, 800 *A.*2d 73 (citing *Colucci v. Oppenheim,* 326 *N.J.Super.* 166, 180, 740 *A.*2d 1101 (App.Div. 1999), *certif. denied,* 163 *N.J.* 395, 749 *A.*2d 369 (2000)). Although each of these avenues of relief is based on different theoretical approaches, "it is now clear that deviation from the standard of care and failure to obtain informed consent are simply sub-groups of a broad claim of medical negligence." *Howard, supra,* 172 *N.J.* at 546, 800 *A.*2d 73 (quoting *Teilhaber v. Greene,* 320 *N.J.Super.* 453, 463, 727 *A.*2d 518 (App.Div.1999)).

The Court traced the history of these causes of action, noting that initially the doctrine of informed consent was tied to the tort of battery but has evolved to become firmly established as a negligence concept. *Howard, supra,* 172 *N.J.* at 546, 800 *A.*2d 73; *see also Largey v. Rothman,* 110 *N.J.* 204, 207, 540 *A.*2d 504 (1988). The early cases recognized a cause of action for "unauthorized touching" or "battery" when a doctor did not obtain a patient's consent to perform a medical procedure. *Howard, supra,* 172 *N.J.* at 546, 800 *A.*2d 73; *see, e.g., Mohr v. Williams,* 95 *Minn.* 261, 104 *N.W.* 12, 14–15 (1905) (finding doctor liable for operating on left ear when permission was given only for surgery on right ear); *Schloendorff v. Society of New York Hosp.,* 211 *N.Y.* 125, 105 *N.E.* 92, 93 (1914) ("a surgeon who performs an operation without his patient's consent commits an assault for which he is liable in damages."), superceded by N.Y. PUBLIC HEALTH LAW § 2805–d.

■ "By the mid-twentieth century, as courts began to use a negligence theory to analyze consent causes of action, the case law evolved from the notion of consent to *informed* consent, balancing the patient's need for sufficient information with the doctor's perception of the appropriate amount of information to impart for an informed decision." *Howard, supra,* 172 *N.J.* at 547, 800 *A.*2d 73 (emphasis in original) (citing *Largey, supra,* 110 *N.J.* at 208, 540 *A.*2d 504). In New Jersey, like many states, informed consent

is "a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him [or her] to 'evaluate knowledgeably the options available and the risks attendant upon each' before subjecting that patient to a course of treatment." *Howard, supra,* 172 *N.J.* at 548, 800 *A.*2d 73 (citing *Perna, supra,* 92 *N.J.* 446, 457 *A.*2d 431 (1983) (quoting *Canterbury v. Spence,* 464 *F.*2d 772, 780 (D.C.Cir.), *cert. denied,* 409 *U.S.* 1064, 93 *S.Ct.* 560, 34 *L. Ed.*2d 518 (1972))).

 Therefore, when bringing a claim based on lack of informed consent, "the patient must prove that the doctor withheld pertinent medical information concerning the risks of the procedure or treatment, the alternatives, or the potential results if the procedure or treatment were not undertaken." *Howard, supra,* 172 *N.J.* at 548, 800 *A.*2d 73 (citing *Perna, supra,* 92 *N.J.* at 460, 457 *A.*2d 431). The plaintiff must also prove causation, which requires a showing by plaintiff that "a reasonably prudent person in plaintiff's position would have declined to undergo the treatment if informed of the risks that the defendant failed to disclose." *Howard, supra,* 172 *N.J.* at 548, 800 *A.*2d 73 (citing *Canesi v. Wilson,* 158 *N.J.* 490, 504–05, 730 *A.*2d 805 (1999)). More specifically,

> [t]o establish a prima facie case for medical negligence premised on a theory of liability for lack of informed consent, a plaintiff must show "(1) the physician failed to comply with the [reasonably-prudent-patient] standard for disclosure; (2) the undisclosed risk occurred and harmed the plaintiff; (3) a reasonable person under the circumstances would not have consented and submitted to the operation or surgical procedure had he or she been so informed; and (4) the operation or surgical procedure was a proximate cause of plaintiff's injuries."
>
> [*Howard, supra,* 172 *N.J.* at 549, 800 *A.*2d 73 (quoting *Teilhaber, supra,* 320 *N.J.Super.* at 465, 727 *A.*2d 518) (citations omitted).]

 In an informed consent case the damages analysis involves a comparison between the condition a plaintiff would have been in had the patient been properly informed and not consented to the risk, with the plaintiff's impaired condition as a result of the risk occurrence. *Howard, supra,* 172 *N.J.* at 549, 800 *A.*2d 73 (citing *Canesi, supra,* 158 *N.J.* at 505, 730 *A.*2d 805). In an action based on lack of informed consent,

the plaintiff must prove not only that a reasonably prudent person in [his or] her position, if apprised of all material risks, would have elected a different course of treatment or care. In an informed consent case, the plaintiff must additionally meet a two-pronged test of proximate causation: [he] or she must prove that the undisclosed risk actually materialized and that it was medically caused by the treatment.

[*Howard, supra,* 172 *N.J.* at 550, 800 *A.2d* 73 (quoting *Canesi, supra,* 158 *N.J.* at 505, 730 *A.2d* 805).]

■ A medical battery cause of action is also recognized in common law where a doctor performs a surgery without consent, rendering the surgery an unauthorized touching. *Howard, supra,* 172 *N.J.* at 550, 800 *A.2d* 73 (citing *Perna, supra,* 92 *N.J.* at 460–61, 457 *A.2d* 431). Battery is an intentional tort and as such "is reserved for those instances where either the patient consents to one type of operation but the physician performs a substantially different one from that for which authorization was obtained, or where no consent is obtained." *Howard, supra,* 172 *N.J.* at 550, 800 *A.2d* 73 (citations omitted).

■ "In an action for battery, a patient need not prove the physician deviated from either the applicable standard for disclosure or the standard for performance of the operation." *Ibid.* (citing *Perna, supra,* 92 *N.J.* at 460–61, 457 *A.2d* 431). Thus, "[a]n operation undertaken without [any] consent (battery) even if perfectly performed with good medical results may entitle a plaintiff to at least nominal and even punitive damages." *Howard, supra,* 172 *N.J.* at 550, 800 *A.2d* 73 (quoting *Whitley–Woodford v. Jones,* 253 *N.J.Super.* 7, 11, 600 *A.2d* 946 (App.Div.1992) (citations omitted)).

In *Howard* the Court classified *Perna* as representing "the unusual circumstance where the consent granted was vitiated, rendering the circumstances the equivalent of an unauthorized touching—in other words, a battery." *Howard, supra,* 172 *N.J.* at 550, 800 *A.2d* 73. It expressly found *Perna* to be factually inapposite because in *Perna,* "a different person from the one to whom consent was given actually performed the procedure." *Howard, supra,* 172 *N.J.* at 552, 800 *A.2d* 73. The Court conclud-

ed that "although a claim for battery will lie where there has been 'ghost surgery' or where no consent has been given for the procedure undertaken, if consent has been given for the procedure only a claim based on lack of informed consent will lie." *Ibid.* The Court continued,

[a] claim based on lack of informed consent properly will focus then on the adequacy of the disclosure, its impact on the reasonable patient's assessment of the disclosure, its risks, alternatives, and consequences of the surgery, and the damages caused by the occurrence of the undisclosed risk.

[*Ibid.* (citation omitted).]

The Court declined to extend common law to allow a deceit-based cause of action when the patient's damages from the alleged "fraud" arose exclusively from the doctor-patient relationship involving the plaintiff's medical procedure. *Id.* at 553–54, 800 *A.*2d 73. The Court was concerned that would allow the possibility of punitive damages and would "circumvent the requirements for proof of both causation and damages imposed in a traditional informed consent setting." *Id.* at 554, 800 *A.*2d 73.

### III

▬▬ In the case before us, Dr. Reich had consent to operate on plaintiff and did so. Plaintiff elected to proceed solely against Dr. Reich. He dismissed his claim against the two assisting physicians, the alleged "ghost surgeons," the only ones against whom a claim for battery might lie,[5] and against Dr. Graham, who did not perform the vascular portion of the surgery. Under the case law, a battery claim cannot lie against a primary surgeon who allegedly promises his patient a particular assisting surgical specialist and who substitutes another similarly qualified physician of that same surgical specialty.

▬▬ Plaintiff presented no evidence of a deviation by Dr. Reich from the standard of care or of any injuries sustained by

---

[5] We do not comment on the merits of such a claim as that issue is not before us.

plaintiff based on Dr. Crowley assisting rather than Dr. Graham. Nor did he present any evidence of medical negligence premised on a theory of lack of informed consent, i.e. that a reasonably prudent patient in the plaintiff's position would not have consented to undergo the spinal surgery. Howard, *supra*, 172 *N.J.* at 558, 800 *A.*2d 73. All Dr. Tiedrich opined was that the spinal surgery performed by Dr. Reich "exacerbated [plaintiff's] previous pain and condition" and "resulted in significant pain in the lower extremity, including the diagnosis of reflex sympathetic dystrophy" and the "development of retrograde ejaculation." The record is devoid of any evidence linking these conditions to negligence by Dr. Reich. The only condition involving vascular surgery was retrograde ejaculation which plaintiff knew was a risk of surgery regardless of which surgeons were involved in the operation. This fact was clearly acknowledged by plaintiff in his deposition:

Q: What did you believe the role of the vascular surgeon was such that you wanted Dr. Graham to be present?

A: To make sure I wouldn't have the condition of retrograde ejaculation.

. . . .

Q: And at the time that you had surgery you understood, did you not, that one of the risks of the surgery regardless of who did that, was that you would or could end up with retrograde ejaculation, whether Dr. Graham was involved or any other doctors?

A: Yes, that was proposed to me.

Q: And when you consented to the surgery, did you understand that you were consenting—when you consented you had an understanding that that was a risk, that you may have had retrograde ejaculation?

A: Yes.

That this condition was a known risk of the spinal fusion is further corroborated by Dr. Reich's instructions to plaintiff regarding donation of sperm prior to the procedure.

 Even if plaintiff were entitled to damages flowing from breach of a fiduciary duty of good faith and fair dealing, the record is devoid of evidence that he suffered emotional distress resulting from belatedly learning that Dr. Graham had not performed the vascular surgery. Plaintiff's deposition testimony of

his last office visit with Dr. Reich when he confronted him with this knowledge, merely recites Dr. Reich's angry response and concludes that plaintiff "then looked at Christine [the case manager] and we just ... couldn't believe what happened. And we got up and we left." Dr. Vasquez's post-surgery notes dealt with plaintiff's medical condition resulting from the known risks of surgery: he was "depressed and anxious *about his current medical condition*" "cripple and sterile," "upset about outcome of surgery," "unable to walk," "unable to sleep," and "depressed and angry about his current *physical condition*. (emphasis added)." The notes contain no reference to emotional distress relating to a feeling of betrayal by Dr. Reich or in any way relating to the substitution of vascular surgeons, and plaintiff presented no report by Dr. Vasquez elaborating upon these notes. Plaintiff had the opportunity to put forward his best case in opposition to summary judgment and cannot now assert that "at their depositions and subsequently at [t]rial, [his] relatives and others would be able to further describe his emotional distress."

In considering defendant's summary judgment application, the court properly accepted plaintiff's version of the facts and assumed the existence of a promise by Dr. Reich for Dr. Graham to assist in the surgery. The court also properly concluded as a matter of law that plaintiff could not avail himself of an action for battery against Dr. Reich, as there was no non-consensual touching, and thus he is not entitled to bring his case to the jury for nominal or punitive damages. The court also reached the correct legal conclusion in dismissing the balance of plaintiff's claims based on lack of proximately caused injury.

Affirmed.